RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0153P (6th Cir.)
File Name: 03a0153p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.                No. 01-4077

RALPH M. DANIEL, JR.,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-00089—Patricia A. Gaughan, District Judge.

Argued: March 13, 2003

Decided and Filed: May 22, 2003

Before: CLAY and ROGERS, Circuit Judges; COFFMAN,
District Judge.[*]

---

**COUNSEL**

**ARGUED:** Melissa W. Friedman, Roanoke, Virginia, for
Appellant. Matthew B. Kall, UNITED STATES
ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:**

---

[*] The Honorable Jennifer B. Coffman, United States District Judge for
the Eastern and Western Districts of Kentucky, sitting by designation.

Melissa W. Friedman, Anthony F. Anderson, Roanoke,
Virginia, for Appellant. David A. Sierleja, UNITED
STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

JOHN M. ROGERS, Circuit Judge. A jury convicted
Ralph M. Daniel, Jr. ("Daniel") of one count of wire fraud, in
violation of 18 U.S.C. § 1343. Daniel now appeals, arguing
that there was insufficient evidence of a "scheme" to defraud,
or of his intent to defraud, or of a wire communication in
furtherance of the scheme. Daniel also contends that the
district court erred by refusing to instruct the jury that it
should acquit him if it had a reasonable doubt regarding
whether he had intended to repay the money. Finding no
merit to his claims, we affirm.

**Facts**

The fraud for which Daniel was convicted consisted of
unauthorized taking of company money to cover margin calls
from his personal stock broker, and misrepresenting what he
was doing to keep from being questioned. Daniel claims that
he intended to pay the money back when, as he hoped, the
price of his stock bounced back up, but that did not happen.

In 1997 Daniel was an owner and operator of Business
Management Services, Inc. ("BMS"), a payroll services
company located in Roanoke, Virginia. A business
employing BMS would send BMS the lump sum amount
owed to the business's employees, a few days before each
"pay day." During the time between an employer's initial
deposit and the employees' subsequent withdrawals, BMS
would deposit the money in Client Account No. 10 ("Account
No. 10") and invest the money in overnight
investments—though only in investments that were secure
and conservative, because it was important that the clients'
money be available when it was time to pay it out.

In August of 1997, BMS was purchased by Century Business Services, Inc. ("CBIZ"), a holding company engaged in the business of acquiring accounting and payroll management corporations. BMS was renamed Century Payroll, Inc. ("Century"), Daniel was left in place to continue his former duties, and Century apparently kept using Account No. 10 as it had previously. In exchange for his ownership interest in Century, Daniel received 274,423 shares of CBIZ stock, worth approximately $2.7 million.

Daniel placed his CBIZ shares in a margin account with Davenport & Co. ("Davenport"), an investment firm. Under the terms of this account, Daniel could purchase additional stock or withdraw cash from Davenport on credit, using as collateral his equity in his existing investments managed by Davenport. When the value of Daniel's equity in his investments fell below a certain level—as would happen if the value of his stock declined—then Davenport would send him a "margin call," requiring him to repair his equity by either selling the stock or by paying cash into his account. Daniel kept his CBIZ stock and bought more CBIZ stock on margin.

Beginning in October of 1998 the value of CBIZ stock began to fall, and Davenport issued Daniel a margin call. Instead of selling his CBIZ stock, Daniel approached Century's controller, Robert St. Lawrence, and had him draw a check payable to Daniel for $199,750 from Account No. 10. The loan was listed on Century's Investment Worksheet as an investment from Account No. 10, and the accounts receivable column listed interest accrued on the loan. Though CBIZ headquarters could have found the loan amount listed in the financial statements submitted by Century, the latter's monthly and yearly statements would not ordinarily (and did not) specify with whom the money was invested. The monthly statements did list the interest accrued on the loan as income to Century, but Daniel's name was not listed, and only his initials—"RMD"—were placed next to the entry. St. Lawrence asked no questions about this loan; St. Lawrence had some personal acquaintance with Daniel's finances and knew that he was well-off, so he did not see the loan as

contravening the policy of investing Account No. 10's funds conservatively.

Daniel proceeded to buy more CBIZ stock on margin, and as CBIZ stock declined steadily through 1998 and 1999, Davenport issued a series of margin calls. On March 16, 1999, Daniel approached Jennifer Duff, who had recently replaced St. Lawrence as Century's controller, and asked for a blank check from Account No. 10. Duff gave him a check without asking what it was for, and Daniel used it to deposit $300,000 into his Davenport account. Century's vice president, Geoff Duke, heard about the check from Duff, and inquired about it with Daniel. Daniel explained—falsely—that he had invested it as a corporate investment on Century's behalf.

In July of 1999, Daniel withdrew $200,000 from his Davenport account and deposited it with Century, as repayment of his initial $199,750 loan. This payment covered only $250 of the accrued interest, and Duff sent him an email asking when he would repay the rest of the interest. In response, Daniel's email said this would be "no problem. I will give you that at a later date when I pay off the other." Daniel Trial Exhibit No. 14.

On September 27, 1999, Daniel had Controller Duff write a check to him for $259,000, from Account No. 10. He explained to Duff that he was having Century invest with Davenport in such an odd manner—writing a check out to him and then writing a check to Davenport from his personal account, rather than simply having Century send a check to Davenport—because due to his personal relationship with his broker at Davenport he could get a better interest rate. This was false, but Duff trusted Daniel and was content with this explanation.

Century Vice-President Duke, however, was not satisfied. Duke had been under the impression that Century was investing directly with Davenport, and had been waiting in vain for Davenport to send Century the regular financial statements. After the September 27 check was issued, he

asked Daniel about the status of these investments, and Daniel gave him the same better-interest-rate explanation he had given to Duff. Duke, skeptical, sent Daniel an email the next day observing that though it was fine to invest Century's Account No. 10 money with Davenport if it was safe, it was not permissible to put this client money to personal use. According to Duke, Daniel "was upset with my E-mail," because "he felt like I was accusing him of doing something wrong." Joint Appendix ("J.A.") at 281–82. In subsequent conversations, Daniel admitted that he had invested the money in CBIZ stock for personal purposes, but gave Duke the (at that time untrue) explanation that he was an "insider" and could not sell the stock.

When Duke asked Daniel if he had permission to take out these loans, Daniel told Duke that the people at CBIZ headquarters "didn't want to know the details," but they had authorized him "to do whatever he needed to do to keep sound selling the company stock," J.A. at 283—apparently meaning that he should do whatever was necessary to meet his margin calls and keep Davenport from selling his CBIZ stock. Duke, persisting, asked what CBIZ's CFO, Charles Hamm, would say about it if Duke called him; Daniel replied, "[Y]ou do what you want to do, but they said they didn't want to know the details." J.A. at 283. Though dissatisfied, Duke let matters rest there and agreed with Daniel's request not to tell anyone else about the loans, but Duke did succeed in getting Daniel to sign a $570,000 promissory note for the amounts owing at that time.

Duke's inquiry did not end the withdrawals, however. As the value of CBIZ's stock continued to fall (Daniel continuing to purchase CBIZ stock nevertheless), Daniel had Controller Duff issue him eight more checks from Account No. 10, as follows: $100,000 on October 25, 1999; $50,000 on November 1, 1999; $300,000 on December 1, 1999; $260,000 on December 22, 1999; $150,000 on January 4, 2000; $200,000 on January 7, 2000; $200,000 on January 27, 2000; and $1,520,000 on February 1, 2000. Daniel signed promissory notes for each, though none of these notes was

forwarded to CBIZ headquarters. Daniel repaid $350,000 of the money on December 13, 1999, but this (along with his payments made the previous summer) was all he ever repaid.

With regard to the final check mentioned above, for $1.5 million, Daniel made a point of finding out when Duke would be leaving, and it was during Duke's absence that Daniel had Duff write this check—the largest of all. When Duke nevertheless learned of the withdrawal and confronted Daniel, Duke was rebuffed and, in Duke's words, Daniel "got a little bit upset and said that he didn't have to ask my permission to do a damned thing." J.A. at 288.

In March of 2000, Duke—concerned that $3 million missing from Account No. 10 might cause clients' paychecks to bounce—asked Daniel to return the money. (As of April 2000, Century's net equity was $1.5 million.) Daniel told Duke he did not have the money. A few days later, as Century's management discussed the implementation of its new computerized accounting system, Daniel told Duke to put all of Century's books on the system, except Account No. 10—thereby preventing the loans drawn against that account from being available for CBIZ's perusal, as they would have been if that account had been on the system.

As a result of these events Duke confronted Daniel on April 24, 2000, asking for written proof that CBIZ had authorized Daniel's withdrawals. Daniel offered to put up collateral for the loans, and agreed to have CBIZ send written authorization. Daniel called CBIZ CFO Hamm the same day. Hamm testified that Daniel led him to believe that Daniel needed a letter verifying that he was employed by Century, for purposes of a loan. Daniel did not make it clear, however, that the loan was from Century itself, and Hamm—assuming that the loan was from some other organization—told Daniel to draft the letter and send it to him for a signature.

Later the same day Daniel sent a fax to Hamm, which Hamm's assistant typed up verbatim on CBIZ letterhead. It was addressed to Century, and read, "I've been advised by [Ralph] Daniel concerning the loan made to him for $3

million plus accrued interest." J.A. at 119. After reading the letter, Hamm realized that Daniel had taken the loan from Century itself, and immediately resolved not to sign it, since CBIZ did not ordinarily allow employees to borrow money without prior authorization, and Daniel had no such authorization. Hamm did not fax the letter back, and when Daniel called later that day asking about it, Hamm—unsure what to do—told Daniel that "this could be an issue." J.A. at 108.

Hamm discussed the situation with CBIZ President Grisko, who in turn talked with Daniel the next day. According to Grisko, Daniel was very nervous, asked what he could do "to make this thing go away," and told Grisko he could not repay the money. J.A. at 130.

On February 21, 2001, Daniel was charged with one count of wire fraud, in violation of 18 U.S.C. § 1343. A jury found him guilty, and the district court denied Daniel's motion for acquittal. The court sentenced Daniel to 46 months in prison followed by two years of supervised release, and ordered him to pay restitution to Century in the amount of $3,539,330.

### Analysis

### I. Sufficiency of Evidence to Convict Daniel of Wire Fraud

"The relevant question in determining the sufficiency of the evidence to support a guilty verdict is whether 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Clark*, 928 F.2d 733, 736 (6th Cir. 1991) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A defendant bringing such a challenge bears a "very heavy burden." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986) (quoting *United States v. Soto*, 716 F.2d 989, 991 (2d Cir. 1983)).

The jury found Daniel guilty of violating 18 U.S.C. § 1343, which provides that

> [w]hoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned . . . .

To convict a defendant of wire fraud, the government must prove "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Prince*, 214 F.3d 740, 747–48 (6th Cir. 2000) (footnote omitted).

### A. Scheme to Defraud

The government proved a scheme to defraud by presenting sufficient evidence of several material misrepresentations. "A scheme to defraud includes any plan or course of action by which someone intends to deprive another by deception of money—deprive another by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479 (6th Cir. 1999) (reciting an instruction given to the jury).[1] "[T]he scheme to defraud element required under

---

[1] We note that cases construing mail fraud can be used in analyzing wire fraud. *See Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here."); *United States v. Mills*, 199 F.3d 184, 188 (5th Cir. 1999) ("The Supreme Court has said that because the mail and wire fraud statutes share the same language in relevant part, the same analysis applies to each. The parties in their briefs, and we in this opinion, accordingly rely upon both mail fraud and wire fraud cases to inform our resolution of this appeal.") (internal citations omitted); *see also United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994) (analyzing mail and wire

[18 U.S.C.] § 1341 is not defined according to a technical standard. The standard is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979) (quoting *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973)).

It is clear that as an element of the "scheme or artifice to defraud" requirement, the government must prove that the defendant said something *materially* false. *See Neder v. United States*, 527 U.S. 1, 25 (1999). At oral argument in the present case, however, Daniel's counsel indicated that for a misrepresentation to be material, the fraud victim must have *actually relied* on it. Over the years we have said in dictum (in opinions making the different point that mail fraud requires proof of intent) that mail fraud requires deception "which accomplishes the end designed." *See Epstein v. United States*, 174 F.2d 754, 765 (6th Cir. 1949); *United States v. Lichota*, 351 F.2d 81, 90 (6th Cir. 1965); *Am. Eagle Credit Corp. v. Gaskins*, 920 F.2d 352, 353 (6th Cir. 1990); *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997). And in *United States v. Schilling*, 561 F.2d 659, 662 (6th Cir. 1977), we found that the government had provided sufficient evidence that the defendant's fraud had accomplished the end designed. But none of those cases actually held that a mail or wire fraud conviction would not stand without such evidence. On the contrary, we have held flatly that "reliance is not an element of mail or wire fraud." *United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994) ("[T]he mail and wire fraud statutes do not require proof that the intended victim was actually defrauded; the actual success of a scheme to defraud is not an element of either § 1341 or § 1343.").

The Supreme Court's more recent decision in *Neder*, *supra*, makes it even clearer that actual reliance is not required for mail or wire fraud. In *Neder* the Court held that the mail and

---

fraud together).

wire fraud statutes incorporated the common-law requirement of materiality. 527 U.S. at 20-25. In doing so, the Court explicitly rejected the argument that a materiality requirement included a reliance requirement:

> the Government is correct that the fraud statutes did not incorporate *all* the elements of common-law fraud. The common-law requirements of "justifiable reliance" and "damages," for example, plainly have no place in the federal fraud statutes. By prohibiting the "scheme to defraud," rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted. But while the language of the fraud statutes is incompatible with these requirements, the Government has failed to show that this language is inconsistent with a materiality requirement.

527 U.S. at 24–25 (citations omitted) (emphasis in original). Actual reliance is thus "plainly" not required in order for the government to establish that a misrepresentation was material.

A reasonable jury could have found that Daniel knowingly made several material misrepresentations, which is to say that he made several assertions he knew were false and that would have affected a reasonable person's actions in the situation. First, he told Controller Duff (1) that he was making investments on behalf of Century, and (2) that in putting the money into his own account he was obtaining a special rate. A reasonable jury could have found that Daniel knew that both of these things were not true, and that he made the statements so Duff would let him take the money. Second, after the first loan Daniel falsely told Century Vice-President Duke that the loan was a corporate investment made on Century's behalf. This calmed Duke's concerns for several months, and it was only after the third loan that Duke inquired further and learned the truth. Third, even when Daniel did admit that the loan was for personal reasons, he made three more representations that a reasonable jury could have deemed false and material: (1) that CBIZ had authorized the

withdrawals, (2) that CBIZ wanted no details, and (3) that at one point he was legally precluded from selling his CBIZ stock to meet the margin calls.

Daniel contends, however, that his statement to Controller Duff that the $300,000 check was for a corporate investment was not material because he made it only *after* the check had issued. This assumes that the timing of the misrepresentation is decisive, but Daniel cites no legal support for such a rule, nor do we find any. *See United States v. Bonallo*, 858 F.2d 1427, 1433 (9th Cir. 1988) ("Not surprisingly, we have found no cases suggesting that the misrepresentation must actually precede the transfer of money or property to the perpetrator in order to violate the mail fraud statute. Such a timing requirement would contradict the broad reading afforded its provisions."). We conclude that this argument fails, and that the government presented sufficient evidence of not only one but several material misrepresentations.

## B. Intent to Defraud

The government showed that Daniel also had the requisite intent to defraud by presenting sufficient evidence that Daniel intended to deprive Century of money, even if only in the short-term.

To convict a defendant of wire fraud the government must prove specific intent, which means

> not only that a defendant must knowingly make a material misrepresentation or knowingly omit a material fact, but also that the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission.

*United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998). "It must also be borne in mind that the question of intent is generally considered to be one of fact to be resolved by the trier of the facts . . . and the determination thereof should not

be lightly overturned." *United States v. Hopkins*, 357 F.2d 14, 18 (6th Cir. 1966).

The question here is whether Daniel made his misrepresentations intending to get Century to loan him money that it otherwise would not have loaned to him. There was more than sufficient evidence for a reasonable jury so to find. Account No. 10 contained *client* funds, which would normally be treated with special care because the money did not belong to Century, and because it was coming and going continually. Daniel knew that Century's policy was to invest those funds conservatively, in *overnight* investments; it was not CBIZ's policy to allow employees to take out personal loans from client funds, and a jury could reasonably have believed that Daniel knew this; Daniel had reason to believe that Century Vice-President Duke would put a stop to the unauthorized loans if he knew the truth; Daniel waited until Duke was out of town to take the $1.5 million loan; Daniel behaved suspiciously with CBIZ CFO Hamm; and a jury could conclude from CBIZ President Grisko's testimony that in his conversation with Daniel the latter spoke and behaved like someone who knew he was guilty.

Daniel contends that the intent must be to injure or harm the victim, and argues that because the jury could have found (1) that he planned to repay the loans, (2) that he believed in good faith that he was acting in CBIZ's best interest, and (3) that he also believed that allowing his CBIZ stock to be sold would harm CBIZ's interests, he therefore lacked the requisite intent to harm and he is being punished, essentially, for a breach of contract. We agree that the intent must be to injure or harm; this is no more than to say that the intent must be to deprive the victim of money or property. *See Gold Unlimited, Inc.*, 177 F.3d at 479 ("A scheme to defraud includes any plan or course of action by which someone *intends to deprive another* by deception of money[.]" (emphasis added)); *Horman v. United States*, 116 F. 350, 352 (6th Cir. 1902) (noting that the intent in mail fraud "must be to injure, which doubtless may be inferred when the scheme has such effect as a necessary result of carrying it out"); *see*

*also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Although the government is not required to prove actual injury, it must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent." (emphasis omitted)). Daniel, however, would have us take the words "harm" and "deprive" in a grand sense. That is, though he admittedly intended to deprive Century and CBIZ of money in the short-term by taking improper loans, he did so in hopes of benefitting them in the long-term by repaying the loans and retaining the stock, and consequently he intended neither to harm the businesses nor deprive them of money. But neither law nor policy supports this approach, which would have the jury look beyond his bad conduct to his overall motives. It is sufficient that the defendant by material misrepresentations intends the victim to accept a substantial risk that otherwise would not have been taken. *See United States v. Benny*, 786 F.2d 1410, 1417 (9th Cir. 1986) (holding, in regard to bank fraud, that "[w]hile an honest, good-faith belief in the truth of the misrepresentations may negate intent to defraud, a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all"); *United States v. Fischl*, 797 F.2d 306, 309–11 (6th Cir. 1986) (upholding a mail fraud conviction, even though the defendant's receipt of a kickback in connection with a state contract did not cause a money loss to the State of Michigan, where the State would have cancelled the contract if it had known about the scheme). The government had only to establish that Daniel intended to deprive Century of money in the short-term, and it presented sufficient evidence for the jury so to find.

## C. Use of an Interstate Electronic Communication in Furtherance of the Scheme

The government also provided sufficient evidence of the use of an interstate electronic communication in furtherance of the scheme to defraud—Daniel's attempt by fax to elicit a letter that would apparently authorize his actions. The wire fraud statute requires that the wire communication be

employed "for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. This means that the communication must be sufficiently related to the scheme, which is to say that "the scheme's completion or the prevention of its detection must have depended in some way on the charged mailing." *United States v. Castile*, 795 F.2d 1273, 1278 (6th Cir. 1986). The Supreme Court has held that "[m]ailings occurring after receipt of the goods obtained by fraud are within the statute if they 'were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'" *United States v. Lane*, 474 U.S. 438, 451–52 (1986) (quoting *United States v. Maze*, 414 U.S. 395, 403 (1974)). This "lulling theory" applies to both mail and wire fraud. *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994).

Daniel argues that the lulling theory is inapposite here because his wire communication—the letter he faxed to CBIZ CFO Hamm—did not in fact lull anyone's concerns, but rather revealed his activities and led to his exposure. Nevertheless, the Supreme Court has rejected the argument that "mailings that someday may contribute to the uncovering of a fraudulent scheme cannot supply the mailing element of the mail fraud offense," explaining that "[t]he relevant question at all times is whether the mailing is part of the execution of the scheme *as conceived by the perpetrator at the time*, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud." *Schmuck v. United States*, 489 U.S. 705, 715 (1989) (emphasis added). In this case we similarly find that the relevant inquiry is whether Daniel intended the letter to lull concerns, and it matters not that the letter turned out to have the opposite effect. And there was substantial evidence from which the jury could have found that such was his intent, given that Daniel faxed the letter in response to Duke's threat to expose the scheme unless Daniel provided written authorization. We conclude that Daniel's argument fails.

## II.  Daniel's Proposed Jury Instruction

Daniel argues that the district court should have instructed the jury that "[i]f you have a reasonable doubt as to whether Mr. Daniel borrowed the funds intending to repay them, then you must find that he did not have the intent to defraud and you must find him not guilty." Daniel Br. at 21–22.  Contrary to Daniel's argument, the district court did not err in refusing to give this instruction.

We may reverse a district court's refusal to deliver a requested jury instruction only "if that instruction is '(1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense.'" *United States v. Mack*, 159 F.3d 208, 218 (6th Cir. 1998) (quoting *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991)). Daniel's argument founders on the first element.  As we noted above, a good-faith intent to repay does not negate an intent to defraud.  Daniel's proffered instruction was an incorrect statement of the law, and consequently this claim, too, fails.

### *Conclusion*

Finding no merit to Daniel's claims, we AFFIRM the judgment of the district court.