NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0259n.06

Case Nos. 24-3262/3409

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

May 21, 2025

KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| ARTHUR FAYNE, | ) | OHIO |
| Defendant-Appellant. | ) ) | |
| | ) | OPINION |

Before: GRIFFIN, NALBANDIAN, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** Arthur Fayne appeals his convictions and the district court's restitution order after a jury convicted him on nine counts of wire fraud. Discerning no error, we affirm.

## I.

Arthur Fayne owned Business Development Concepts, LLC ("BDC"), an Ohio company that "oversaw construction projects and the purchase of equipment, supplies[,] and inventory for the projects." R. 106, PageID 1677. Northeast Ohio Neighborhood Health Services, Inc. ("NEON") is an Ohio nonprofit corporation that operated as a "federally qualified health center network of community health centers and provided primary care[] medical services for adults and children in . . . Cleveland." *Id.* NEON's for-profit subsidiary is Community Integrated Services, Inc. ("CIS"). NEON sponsored a project, the East Side Market ("ESM"), "to redevelop a vacant building into a grocery store/community center in the Glenville neighborhood." *Id.*

NEON employed BDC to oversee and facilitate the project development. Over the course of the project, the State of Ohio, the City of Cleveland, and Cuyahoga County provided grants to NEON. The State of Ohio granted $750,000, the City of Cleveland $867,000, and Cuyahoga County $500,000. So how was the payment process supposed to work? A contractor would submit an invoice to Fayne's company BDC; BDC would forward the invoice to NEON; NEON would loan money to CIS to fund the invoice; CIS would issue payment to BDC for the contractor's work; and BDC would pay the contractor.[1] Only the payments to contractors Albert M. Higley Company ("AMHigley") and Crescent Digital are relevant here.

AMHigley was the general contractor for the ESM project. Between December 2016 and January 2018, Fayne regularly diverted payments he obtained from NEON that were intended to fund AMHigley's general contracting work on the ESM project. By January 2018, out of $2,629,740.38 that NEON paid Fayne for AMHigley, Fayne paid AMHigley only $1,870,634.46, creating a $759,105.92 deficit.

As mentioned above, the money that Fayne received from NEON for AMHigley's work was supposed to go directly to AMHigley. At trial, NEON's president and CEO, Willie Austin, testified that when he approved the invoice payments, he expected "[a]ny dollar amount on any invoice that said [AM]Higley, . . . was the expense that would go to [AM]Higley." *Id.* at 1858. And AMHigley's president and CEO, Gareth Vaughan, anticipated receiving payment within 30 to 45 days after invoicing BDC. In February 2018, when AMHigley was owed around $800,000 for unpaid work, Vaughan repeatedly sought payment from Fayne and, ultimately, AMHigley sued. NEON believed that AMHigley had been paid at that time because NEON had sent the payments to BDC. Fayne blamed the funding deficiency on the governmental entities failing to

---

[1] Because NEON and CIS are related entities, we will refer only to NEON funding the ESM project payment scheme.

provide grants. For several reasons, including a funding shortage and other construction difficulties, AMHigley stopped work on the ESM project for several months. Shortly after that, Cuyahoga County contributed $500,000 and NEON then started directly paying AMHigley instead of passing funding through BDC and Fayne "to expedite the payment so that work could begin again." *Id.* at 1879. In total, NEON directly paid AMHigley approximately $2.3 million for work on the ESM project. Eventually, Fayne and BDC relinquished their ownership interest in the ESM project.

Crescent Digital installed audio-visual technology and other electronic equipment for the ESM facility. At Fayne's request, NEON obtained an equipment loan for $469,771.64. Crescent Digital submitted an invoice in the amount of $251,297.24 for its services. Fayne initially paid the entire invoiced amount to Crescent Digital from the equipment loan, but Crescent Digital's CEO Michael Heines sought to return a portion of the payment for work that had yet to be completed. After subtracting a $35,000 personal loan between Heines and Fayne and a seven-percent finder's fee for Fayne, both unapproved and uncommunicated to NEON, Heines returned $125,923.86 to be repaid upon Crescent Digital's completion of its work on the ESM project. Fayne directed Heines to deposit the return payment into his wife's, Gina Fayne, personal account. Of the approximately $125,000 deposited into Mrs. Fayne's account, about $89,500 was transferred to the BDC bank account, and then there were several cash withdrawals and personal expenditures from Mrs. Fayne's account shortly after the deposit. When Crescent Digital completed its work and requested full payment, Fayne could not provide the $125,923.86, but insisted he "would get the funds soon." R. 107, PageID 2027. Fayne again blamed the funding deficiency on the governmental entities providing grants. Fayne later paid Crescent Digital $93,559.42 after he was indicted, leaving an outstanding balance of $32,364.44.

A grand jury indicted Fayne on nine counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts One through Seven related to AMHigley and Counts Eight and Nine related to Crescent Digital). Fayne proceeded to trial, and a jury convicted him on all counts. The district court sentenced Fayne to 18 months' imprisonment. The district court later conducted a restitution hearing and ordered Fayne to pay $840,074.96 in restitution—$32,364.44 to Crescent Digital, $478,704.20 to the City of Cleveland, and $329,006.32 to Cuyahoga County. The district court found that the City of Cleveland and Cuyahoga County assumed NEON's losses and were therefore entitled to restitution.

Fayne now appeals his convictions and the restitution order, raising three claims of error: (1) that the district erred in the way it resolved several evidentiary issues; (2) whether sufficient evidence supports his convictions; and (3) whether the district court erred in its restitution award.

**II.**

Fayne raises several challenges to the district court's evidentiary rulings. We review the district court's evidentiary rulings and limitations on cross-examination for an abuse of discretion. *United States v. Hazelwood*, 979 F.3d 398, 408 (6th Cir. 2020) (evidentiary rulings); *United States v. Ralston*, 110 F.4th 909, 916 (6th Cir. 2024) (limits on cross-examination). We will reverse a conviction for an evidentiary error if it "caused more than harmless error." *United States v. Fisher*, 648 F.3d 442, 449 (6th Cir. 2011) (quotation omitted); *United States v. Kettles*, 970 F.3d 637, 643 (6th Cir. 2020). An error is harmless if it "does not affect substantial rights." Fed. R. Crim. P. 52(a). To that end, we must have a "fair assurance that the verdict was *not* substantially swayed by the error." *Kettles*, 970 F.3d at 643 (internal quotation marks omitted).

*First*, Fayne argues that the district court erred by not allowing him to adduce evidence that AMHigley was eventually paid in full for its work on the ESM project. To the extent that such

evidence was relevant, any error by the district court was harmless. The error was harmless because Fayne argued and elicited testimony that AMHigley received full payment for its work. In his opening statement to the jury, Fayne's counsel asserted that "all the vendors and contracts were paid" and that "Fayne still has [a] relationship with . . . the vendors." R. 106, PageID 1702. AMHigley's president and CEO testified, during cross-examination, that AMHigley was "paid in full." R. 107, PageID 2015. Additionally, Fayne's expert witness testified that AMHigley invoiced approximately $3.8 million for its work on the ESM project, but it was paid approximately $4.1 million, suggesting that AMHigley was paid more than it billed for its services. To top it off, Fayne's counsel reiterated in his closing argument that AMHigley "had been fully paid." R. 109, PageID 2476–77. We have a "fair assurance" that the district court's alleged error did not substantially sway the jury's verdict. *See Id.*

*Second*, Fayne argues that the district court improperly limited evidence about the charged offenses to a thirteen-month timeframe from January 2017 to January 2018. He contends that extending the pertinent timeframe would have allowed him to present evidence that all contractors for the ESM project were paid in full.

Once again, any error was harmless. Fayne's counsel, as mentioned above, told the jury that all vendors and contractors had been paid for their work on the ESM project. NEON's president and CEO testified that Fayne did not owe NEON money. And Fayne's expert testified that the total payments that AMHigley received from February 2016 to October 2018, a period of approximately 33 months, exceeded the amount of AMHigley's invoices.

*Third*, Fayne argues that the district court improperly limited the testimony of his expert witness. Fayne submitted his first expert report in August 2023 that detailed how "the spending and grant reimbursements were appropriate and in accordance with the grant documents." D. 47

at p.37.  Later, on October 16, 2023, the day before trial, Fayne submitted a supplemental report that focused more on the transactions between his bank accounts and the total money AMHigley received in relation to what it invoiced.  The district court excluded this report as untimely and permitted testimony only within the bounds of the first expert report.

Federal Rule of Criminal Procedure 16(b)(1)(C)(ii) requires defendants to provide expert disclosures "sufficiently before trial to provide a fair opportunity for the government to meet the defendant's evidence."  Because Fayne's supplemental expert report did not comply with this rule, the district court did not abuse its discretion in limiting the expert testimony to the bounds of the first expert report.  *See United States v. Lang*, 717 F. App'x 523, 537 (6th Cir. 2017) (upholding a district court's decision to bar a defendant's expert witnesses from testifying as the defendant failed to comply with Rule 16(b)(1)(C)'s notice requirements for those witnesses).

**III.**

Fayne next argues that the government failed to present sufficient evidence supporting his wire-fraud convictions and, therefore, the district court erred in denying his motion for judgment of acquittal.  We review sufficiency-of-the-evidence challenges de novo.  *United States v. Shanklin*, 924 F.3d 905, 917 (6th Cir. 2019).  In assessing the sufficiency of the evidence, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quotation omitted).  We do not "reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury."  *United States v. Ledbetter*, 929 F.3d 338, 353 (6th Cir. 2019) (quotation omitted).  And "we draw all reasonable inferences in support of the jury's verdict and will reverse a judgment for insufficient evidence only if the judgment is not supported by substantial and competent

evidence upon the record as a whole." *United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016) (internal quotation marks omitted). Defendants bringing sufficiency-of-the-evidence challenges bear a "very heavy burden." *Id.* (quotation omitted).

The wire-fraud statute makes it a crime for:

> Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice. . . .

18 U.S.C. § 1343. Thus, to convict Fayne of wire fraud, the government had to prove "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Robinson*, 99 F.4th 344, 354 (6th Cir. 2024) (quotation and footnote omitted). Fayne does not challenge the interstate-wire-communications element.

As to the first element, "[a] scheme to defraud includes any plan or course of action by which someone intends to deprive another . . . by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (quotation omitted). This element is "a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *Robinson*, 99 F.4th at 354 (internal quotation marks omitted). To establish the scheme-to-defraud element, "the government must prove that the defendant said something materially false," thereby influencing the decision of a person of "ordinary prudence and comprehension." *Id.* at 354–55 (quotations omitted).

For the intent-to-deprive element, the government needed to prove Fayne's intent to defraud by showing his misrepresentations caused NEON to give Fayne money that it would

otherwise not have in the absence of the fraud. *Daniel*, 329 F.3d at 487. An intent to deprive may exist "even if only in the short-term," *id.*, meaning a "good faith belief that the victim will be repaid and will sustain no loss is no defense at all," *United States v. Bravata*, 636 F. App'x 277, 287–88 (6th Cir. 2016) (quotation omitted). Importantly, "[i]t must also be borne in mind that the question of intent is generally considered to be one of fact to be resolved by the trier of the facts . . . and the determination thereof should not be lightly overturned." *United States v. Hopkins*, 357 F.2d 14, 18 (6th Cir. 1966) (citations omitted).

The government presented sufficient evidence to convict Fayne of wire fraud for his conduct diverting payments from NEON intended for AMHigley. At trial, the government presented evidence that Fayne invoiced NEON for $2,629,740.38 for AMHigley's work on the ESM project but only paid $1,870,634.46 to AMHigley. The government showed that Fayne made several concurrent and substantial personal expenditures immediately after receiving payments from NEON and that Fayne never fully reimbursed AMHigley for the amount on the invoices.

The government's wire-fraud theory was as follows. Fayne represented that money was owed to AMHigley on the invoices he submitted. Based on that representation, NEON paid Fayne that money believing the indicated amount would reach AMHigley. Fayne did not transfer the indicated amount to AMHigley. As a result, Fayne's failure to disburse funds in the manner that he represented on the invoices amounts to a material misrepresentation that NEON may not have agreed to in the absence of the misrepresentation. *See Daniel*, 329 F.3d at 487.

Fayne responds that he never "represented to NEON or CIS that he had already paid the contractors or that he would immediately pay the subcontractors out of the proceeds of the funds provided by NEON and CIS." D. 47 at p.48. And while he maintains that AMHigley was eventually paid, Fayne did not make those payments. In fact, NEON made up the deficit caused

by Fayne. So even if Fayne did not represent that he would immediately pay AMHigley, he never paid AMHigley the amount owed. Thus, any arguments sounding in installment-payment principles to negate Fayne's intent to deprive NEON of money must fail.

Further, Fayne contends that he paid other ESM contractors instead of AMHigley. But that does not diminish his intent to deprive NEON of money because NEON expected that "[a]ny dollar amount on any invoice that said [AM]Higley, . . . was the expense that would go to [AM]Higley." R. 106, PageID 1858. So if the money went somewhere other than AMHigley, a rational jury could find that Fayne made material misrepresentations to NEON about the destination of the requested funds.

The government also presented sufficient evidence to support Fayne's wire-fraud convictions as to Crescent Digital. The government showed that Fayne directed Crescent Digital's owner, Heines, to transfer $125,923.86 to Gina Fayne's account to be set aside and repaid upon Crescent Digital's completion of its work on the ESM project. As a condition for transferring the advance payment back to Fayne, Heines expected "two equal payments," with one "closer to completion" and "the [remaining] balance due after [Crescent Digital] complete[d] all install work." R. 87-1, PageID 1278. But Fayne could not pay Crescent Digital the money after it completed the work. Instead, as the trial evidence showed, shortly after the deposit into Mrs. Fayne's account, approximately $89,500 was transferred to the BDC bank account and there were several cash withdrawals and personal expenditures from the account. Giving the government "the benefit of all reasonable inferences from the testimony," *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (quotation omitted), the evidence shows that Heines likely would not have entrusted Fayne with the conditional return payment had he disclosed his fraudulent plans, *see Daniel*, 329 F.3d at 487.

Fayne contends Heines "voluntarily gave" Fayne's wife the return payment and that his "failure to return it upon demand" is not a crime. D. 47 at p.46. But his argument is misguided and unsupported by caselaw. "A scheme to defraud is not measured by a 'technical standard,' but rather is a 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *United States v. Rathburn*, 771 F. App'x 614, 621 (6th Cir. 2019) (quoting *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979)).

In *Rathburn*, we held that the defendant made a material misrepresentation when he supplied specimens positive for HIV and Hepatitis B to medical professionals because the contract indicated the defendant would provide screening for such diseases. *Id.* The defendant argued that he merely agreed to screening the specimens which was "[f]ar from a contractual promise of a disease-free specimen." *Id.* (alteration in original). Applying a "common-sense" standard, we reasoned that the "ordinary understanding of a promise to 'test' and 'screen' for HIV and hepatitis creates a reasonable understanding that [the defendant] would not supply specimens in spite of a positive result." *Id.*

That same rationale applies here. The communications between Fayne and Heines created a "reasonable understanding" that Fayne would hold funds in escrow with the expectation that he would remit it upon completion of Crescent Digital's work. *See id.* A jury could find that Fayne acted with the intent to defraud by funneling that money elsewhere immediately after receiving it. *See id.* Thus, sufficient evidence supports Fayne's wire-fraud convictions related to the scheme to defraud Crescent Digital.

**IV.**

Finally, Fayne argues that the district court erred with its restitution award. "We review the propriety of ordering restitution de novo and the amount of restitution ordered for abuse of

discretion." *United States v. Ruiz-Lopez*, 53 F.4th 400, 404 (6th Cir. 2022) (quotation omitted). "[F]ederal courts have no inherent power to award restitution," so such orders are proper only if "authorized by statute." *United States v. Church*, 731 F.3d 530, 535 (6th Cir. 2013) (quotation omitted).

The Mandatory Victims Restitution Act requires that district courts order restitution when sentencing a defendant convicted of an offense "in which an identifiable victim or victims has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1)(B). A victim is a person "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). However, if the victim received compensation from another source with respect to a loss, the district court must "order that restitution be paid to the person who provided . . . the compensation." *Id.* § 3664(j)(1). The "district court has wide latitude to determine the amount of a victim's losses." *United States v. Patel*, 711 F. App'x 283, 287 (6th Cir. 2017) (citing 18 U.S.C. § 3664(f)(1)(A)).

Fayne diverted $759,105.92 from NEON intended for AMHigley. The government claims Fayne used the funds for personal expenditures; Fayne asserts he used all the money he was given by NEON for the ESM project. The exact place or entities Fayne directed the diverted funds to does not matter because Fayne admitted at trial and confirmed at the restitution hearing that he failed to pay all the money due to AMHigley. NEON eventually made up the deficit owed to AMHigley. So, NEON essentially paid the $759,105.92 twice: once to Fayne, which he did not properly remit to AMHigley, and the second time to AMHigley directly. Thus, NEON is a victim because it was "directly and proximately harmed as a result of" Fayne's criminal conduct. 18 U.S.C. § 3663A(a)(2). The district court properly ordered restitution because Fayne caused NEON "pecuniary loss." *Id.* § 3663A(a)(1), (c)(1)(B).

At the time of Fayne's fraud, NEON received grants from the City of Cleveland and Cuyahoga County totaling approximately $1.4 million. Because of those grants, NEON claims it was made whole and Fayne does not owe it any money. But when the City of Cleveland and Cuyahoga County granted NEON money to pay AMHigley's invoice a second time, they assumed NEON's $759,105.92 loss under 18 U.S.C. § 3664(j)(1). Accordingly, the City of Cleveland and Cuyahoga County are entitled to the restitution ordered by the district court because they compensated NEON for its $759,105.92 loss. *See id.* § 3664(j)(1).

For Crescent Digital, the district court properly calculated the restitution award. Heines returned $125,923.86 of the advance payment back to Fayne to hold until Crescent Digital completed its work on the ESM project. After Fayne was indicted, he paid Crescent Digital $93,559.42, leaving a balance of $32,364.44. At the restitution hearing, the government offered an invoice from Crescent Digital confirming the outstanding balance. Thus, the district court did not abuse its discretion in awarding $32,364.44 in restitution to Crescent Digital given the record evidence.

Fayne offers nothing more than a bare denial. He asserts that Crescent Digital's restitution calculation is improper because no evidence connects the invoice relied upon by the district court to the charged conduct from 2018. Without support and stacked against evidence to the contrary, Fayne's argument fails.

**V.**

For these reasons, we **AFFIRM** the district court's judgment.