RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0090p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant/Cross-Appellee*,

    v.

KATRINA ROBINSON,

        *Defendant-Appellee/Cross-Appellant*.

    Nos. 22-5075/5245

───────────────

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:20-cr-20148-1—Sheryl H. Lipman, District Judge.

Argued: October 26, 2023

Decided and Filed: April 17, 2024

Before: GIBBONS, BUSH, and DAVIS, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Christopher E. Cotten, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for the United States. Mathew Jehl, BURCH, PORTER & JOHNSON, PLLC, Memphis, Tennessee, for Katrina Robinson. **ON BRIEF:** Christopher E. Cotten, Naya Bedini, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for the United States. Mathew Jehl, Larry Laurenzi, BURCH, PORTER & JOHNSON, PLLC, Memphis, Tennessee, for Katrina Robinson.

───────────────

## OPINION

───────────────

DAVIS, Circuit Judge. A jury convicted Katrina Robinson, founder and director of The Healthcare Institute ("THI"), of four counts of wire fraud for actions she took in administering a federal grant the organization received from 2015–2019. Robinson filed a post-verdict motion

for a judgment of acquittal ("JOA") on all four counts.  The district court granted the motion as to two of the counts.  In these consolidated appeals, the government challenges the court's grant of JOA on one of those counts, and Robinson appeals the denial of JOA on the remaining two counts.  Robinson also appeals the district court's denial of her oral motion for mistrial with prejudice and her motion for a new trial.  For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this decision.

**I.**

Katrina Robinson founded THI and served as its director during all periods relevant to this appeal.  THI is a for-profit, limited liability company in Memphis, Tennessee, that grew from a limited purveyor of CPR training at its inception to establishing a certified nursing assistant ("CNA") program in the summer of 2015.  Prior to launching the CNA program, THI applied, in March 2015, for a federal grant from the Geriatrics Workforce Enhancement Program ("GWEP")—a program administered by the Health Resources and Services Administration ("HRSA").  HRSA operates under the auspices of the United States Department of Health and Human Services ("HHS").  The application was successful; THI received funding from HRSA between 2015 and 2019.  Among other things, the GWEP grant provided eligible THI students with $900 scholarships to be applied toward the cost of tuition for the CNA program.

The way the grant worked was that when HRSA approved THI's grant and later renewal applications, it sent THI a Notice of Award ("NOA").  Each NOA contained important information, such as an approved budget and reporting requirements that HRSA used to monitor the grant's progress and spending.  The NOAs also listed the amount of money allocated for tuition and fees (i.e., scholarships) for THI students during the year covered by the particular NOA.  For the 2017–2018 year and again for the 2018–2019 year, HRSA awarded THI $90,521.00 for tuition and fees to cover 100 scholarships in each year.  The grant permitted THI to carry over unused funds from one fiscal year to support additional scholarships the following fiscal year.  But THI needed approval from HRSA to do this.  Absent HRSA approval, THI was required to "use" or "lose" the funds by the end of the term for which they were originally granted.

A federal investigation raised concerns that Robinson had used HRSA grant funds for personal expenses. The investigation also uncovered multiple discrepancies in Annual Performance Reports ("APRs") that Robinson had submitted on THI's behalf. APRs were required at the end of each fiscal year and contained information that allowed the project officer to determine whether the project director was successful in meeting the project's stated goals. The investigation revealed that THI's APRs contained inaccurate information on the number of students who graduated from the CNA training program, the number of students who received grant-funded scholarships, and the unique numerical identifiers assigned to students. Despite these significant errors, Robinson, who oversaw preparation of, reviewed, signed, and submitted the APRs, certified that the information in the APRs was correct. At trial, the government sought to prove that the APR "errors" were, in truth, Robinson's intentional manipulations of the numbers to ensure THI's continued receipt of grant monies.

The parties dispute the significance of the APRs in the decision-making process for the continuation of THI's funding. Both sides point to the testimony of Dr. Nina Tumosa, HRSA's grant manager for THI, for support. Robinson highlights Dr. Tumosa's testimony that APRs were "primarily used by HRSA to compare the different programs and to combine reports to show to Congress whether or not as a -- in general, education and training of the healthcare workforce is worthwhile and a good thing to do." (R. 233, PageID 3874). The government directs attention to her testimony that the APRs were "really crucial" to HRSA and a tool to "evaluate future funding." (*Id.* at 3764–65). Dr. Tumosa also declared that a recipient who failed to submit the APR would "not be funded," and that an HRSA project officer who discovered false data on an APR would either give the recipient "an opportunity to correct it" or "say [the award] needs to be closed." (*Id.* at 3765, 3875). If Dr. Tumosa were to discover misrepresentations in reports provided by the recipient, "it would change the evaluation" of the program. (*Id.* at 3871). Further underscoring the role APRs played in the context of the grant, a group within HRSA analyzed the data in the APRs and operated as a "backstop" in the funding process. (*Id.* at 3874).

The second superseding indictment charged Robinson with 4 counts of theft and embezzlement involving a federal program in violation of 18 U.S.C. § 666(a)(1)(A) ("federal

program fraud") and 16 counts of wire fraud in violation of 18 U.S.C. § 1343.  Specifically, Counts 1–4 charged Robinson with stealing property under the custody and control of THI—a federal program grant recipient that satisfied the requisite statutory financial threshold.  Counts 5–17 charged Robinson with wire fraud for individual transactions made from THI's operating account for a variety of alleged personal expenditures.  And Counts 18–20 charged Robinson with wire fraud for fraudulent misrepresentations made to HRSA in THI's APRs that were filed for years 2016–2017, 2017–2018, and 2018–2019, respectively.  The indictment alleged that Robinson's actions were part of an overarching scheme to defraud for the purpose of obtaining money or property belonging to THI.  The manner and means of the scheme described in the indictment included Robinson submitting yearly APRs that contained "fraudulent misrepresentations to representatives of HRSA and others concerning THI, its operations and educational programs."  (R. 107, PageID 431, 443).  The "misrepresentations" took the form of data submissions showing that "certain individuals were students and/or graduates" of the program even though they were not and representations that certain students received scholarships from grant money even though "their education was funded by some other source." (*Id.* at 431).  The indictment further alleged that in these APRs, Robinson represented that "certain student identification numbers were connected to actual students, well knowing that they were not and that no actual students were connected to those numbers."  (*Id.*).  Robinson would then use the grant funds she had acquired for personal expenditures—including two expenditures for wedding-related services.

Trial commenced on September 13, 2021.  At the end of the government's case-in-chief, Robinson moved for JOA on all counts pursuant to Federal Rule of Criminal Procedure 29.  The district court granted the motion as to 15 of the 20 counts, including Counts 1–10 and 13–17. The district court thus acquitted Robinson of all the theft or embezzlement charges and all but five of the wire fraud charges; it denied acquittals for the five individual wire fraud charges contained in Counts 11, 12, 18, 19, and 20.  The jury later found Robinson guilty on Counts 11, 12, 19, and 20 and not guilty on Count 18.  Robinson then filed a post-verdict motion for JOA on the four counts of conviction and for a new trial.  The district court denied Robinson's motion for acquittal as to Counts 11 and 12, granted it as to Counts 19 and 20, and denied her motion for a

new trial.  As a result, Robinson stood convicted of only two of the original twenty counts of the indictment.

Shortly after the district court entered its order resolving Robinson's motion, the government filed a notice of appeal to this court.  In the meantime, the court sentenced Robinson to time-served and one year of supervised release.  Robinson timely appealed.

## II.

"We review 'de novo the sufficiency of the evidence to sustain a conviction'" when a defendant raises a challenge under Rule 29.  *United States v. Emmons*, 8 F.4th 454, 477 (6th Cir. 2021) (emphasis omitted) (quoting *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009)).  Our task is to determine whether, "viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt."  *United States v. Baggett*, 251 F.3d 1087, 1095 (6th Cir. 2001) (quoting *United States v. King*, 169 F.3d 1035, 1038–39 (6th Cir. 1999)).  In doing so, we do not "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury."  *United States v. Jackson*, 470 F.3d 299, 309 (6th Cir. 2006) (quoting *United States v. Davis*, 177 F.3d 552, 558 (6th Cir. 1999)).  Rather, we must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict."  *Id.* (quoting *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001)).  Moreover, "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt."  *United States v. LaVictor*, 848 F.3d 428, 456 (6th Cir. 2017) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).  "[A] defendant claiming insufficiency of the evidence [therefore] bears a very heavy burden."  *Emmons*, 8 F.4th at 478 (quoting *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)).

## III.

### A.  Government's Appeal

*Grant of JOA on Count 19.*  The government contends that the district court erred in granting Robinson's post-verdict motion for acquittal of the wire fraud charged in Count 19,

which alleged misrepresentations made by Robinson in THI's 2017–2018 APR. Specifically, it argues that the evidence at trial showed that the 2017–2018 APR contained false information about both the number of scholarships awarded to students and the identification of students who received the scholarships. And because the 2017–2018 APR made the overall administration of the grant appear successful, it ensured that THI continued to receive funding. In this way, says the government, Robinson's submission of the false 2017–2018 APR constituted a course of conduct intended to deprive the government of money. And as such, says the government, a rational juror could find that it proved each element of wire fraud beyond a reasonable doubt.

> The wire fraud statute states in relevant part that:

> Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, [or] representations . . . transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice, shall be . . . imprisoned . . . .

18 U.S.C. § 1343. Breaking this language down to its central components, the government must prove: "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme;[1] and (3) intent to deprive a victim of money or property." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (quoting *United States v. Prince*, 214 F.3d 740, 747–48 (6th Cir. 2000)); *see also United States v. Maddux*, 917 F.3d 437, 443 (6th Cir. 2019).

### 1. Scheme to Defraud

"A scheme to defraud includes any plan or course of action by which someone intends to deprive another . . . by deception of money or property by means of false or fraudulent pretenses, representations, or promises." *Daniel*, 329 F.3d at 485–86 (quoting *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479 (6th Cir. 1999)). We have defined the scheme to defraud element "to be 'a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *United States v. Bibby*, 752 F.2d 1116, 1125 (6th Cir. 1985) (quoting *United States v. Van Dyke*, 605 F.2d 220, 225 (6th

---

[1]The use of wires affecting interstate commerce is not at issue, therefore, we do not address this element.

Cir.), *cert. denied*, 444 U.S. 994 (1979)). "[A]s an element of the 'scheme or artifice to defraud' requirement, the government must prove that the defendant said something materially false." *Daniel*, 329 F.3d at 486 (emphasis omitted) (citing *Neder v. United States*, 527 U.S. 1, 24–25 (1999)). A misrepresentation is deemed materially false if it could have influenced the decision of a "person[] of ordinary prudence and comprehension." *United States v. Petlechkov*, 922 F.3d 762, 766 (6th Cir. 2019) (quoting *United States v. Jamieson*, 427 F.3d 394, 415–16 (6th Cir. 2005)).

Because courts have not spoken with any greater precision on what constitutes a scheme or artifice to defraud, the issue has been the subject of a great deal of litigation. *See* Jed S. Rakoff, *The Federal Mail Fraud Statute (Part I)*, 18 DUQ. L. REV. 771, 819 (1980); *see also* John C. Coffee Jr., *Modern Mail Fraud: The Restoration of the Public/Private Distinction*, 35 AM. CRIM. L. REV. 427, 463 n.199 (1998). One important limiting principle that has emerged is that although a scheme to defraud need not be fraudulent on its face, it must be reasonably calculated to deceive. *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973). And the fact that a particular scheme is impracticable or ultimately unsuccessful does not necessarily detract from its fraudulent nature. *See United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994); *see also Pasquantino v. United States*, 544 U.S. 349, 371 (2005). Rather, the "essence" of fraud is that the victim is persuaded to believe that which is not so. *United States v. Church*, 888 F.2d 20, 24 (5th Cir. 1989). Similarly, a scheme to defraud is not dependent on what someone intends to do or has done with the money or property acquired through the scheme. Instead, it is the scheme itself—the act of acquiring or attempting to acquire the funds through fraudulent means—that the statute punishes. *See McNally v. United States*, 483 U.S. 350, 356 (1987) (stating that "[i]nsofar as the sparse legislative history reveals anything, it indicates that the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property"),[2] *superseded by statute*, Anti–Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7603, 102 Stat. 4181, 4508 (codified at 18 U.S.C. § 1346).

---

[2]We have "interpreted the mail-fraud and wire-fraud statutes as having essentially the same elements, except for the use of mails versus the wires." *See United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013) (citing *Bibby*, 752 F.2d at 1126).

The government accused Robinson of obtaining money or property belonging to THI by false means, which she then used to make personal purchases. The false means to carry out this scheme included her submission to HRSA of yearly APRs containing multiple misrepresentations of student identification ("ID") numbers, the number of students who had graduated from the program, and the number of students who had received grant-funded scholarships. To prove the misrepresentations, the government presented evidence that Robinson, on THI's behalf, reported 215 scholarships in the 2017–2018 APR, but internal records did not link the scholarships to any student ID numbers listed in the APR. Using state education data coupled with THI student files, the government was able to confirm that, of the alleged 215 students reported, only 161 received scholarships. This evidence provided sufficient grounds for a rational juror therefore to conclude with respect to Count 19 that the government proved that the 2017–2018 APR contained false representations.

a. Materiality

The government also proved that these false representations were material. That is, it showed that the misrepresentations in the APR could have swayed the decision of someone "of ordinary prudence and comprehension." *Petlechkov*, 922 F.3d at 766 (citation omitted). To begin, Dr. Tumosa's testimony demonstrated the connection between the APR information and the decision-making process for funding renewal. In addition to characterizing APRs as "crucial" to the overall grant-assessment process, Dr. Tumosa further explained that the APR was "absolutely . . . used to evaluate future funding." (R. 233, PageID 3765). If the performance report showed that THI had met its goals, Dr. Tumosa would "recommend[] . . . funding for another year." (*Id.* at 3765–66). If the APR was deficient, "[THI] would lose their funding." (*Id.* at 3766). Robinson counters that Agent Haines's testimony showed that the APRs had no direct tie to funding as evidenced by the fact that the APRs were submitted after the fiscal year and thus after THI had already received the funding for the prior year. Robinson further contends that the APRs were primarily used as a progress report. But pointing to conflicting testimony will not support entry of a JOA. It was up to the jury to weigh the competing testimony of witnesses. And it did. Based on the evidence presented, it was not

irrational for a juror to find that the information reported in the APRs was material to the grant-renewal decision making and that the 2017–2018 APR contained falsified information.

Resisting the conclusion that her submission of APRs containing falsified information was material, Robinson shifts focus to another aspect of the scheme to defraud—personal use of the funds. In particular, she argues that the record is bereft of evidence that she made personal purchases between 2017–2019 with federal grant funds. Without such evidence, there is, she insists, no scheme to defraud. But she is mistaken.[3] As we have stated, a scheme to defraud merely requires evidence of a plan through which a defendant "intends to deprive another . . . by deception of money or property." *See Daniel*, 329 F.3d at 485–86 (citation omitted). Whether the scheme was successful or, in this case, how the money was spent, is immaterial to finding a scheme to defraud. *See Pasquantino*, 544 U.S. at 371. This point was driven home in *United States v. Fischl*, where we held that material misrepresentations that led to a public body parting with money, which it would not have otherwise done, was enough to show a scheme to defraud. 797 F.2d 306, 311 (6th Cir. 1986).

Similarly, here, evidence at trial showed that Robinson intended to deprive HRSA both of grant funds it may not have awarded absent the misrepresentations, and of information which it used to determine funding regarding the number of students who had graduated from the program and the number of students who had received grant-funded scholarships. In *Fischl*, the defendant's misrepresentations involved information that would have ended funding for the defendant's project if it had been disclosed to officials. *Id.* at 310. Likewise, had Dr. Tumosa received accurate information about students and scholarships for 2017–2018, THI may have lost

---

[3]In the district court and in response to this court's questioning at oral argument, Robinson asserted that the government's theory for Count 19—that Robinson used misrepresentations in the APR to continue obtaining funding from HRSA constituted a scheme to defraud—was not charged as a standalone scheme. This purported discrepancy between the indictment and the government's theory, she advanced, raised a notice issue. Her assertion arguably evokes the question of whether either a constructive amendment to or material variance from the indictment occurred. But Robinson developed the argument no further. We have routinely held that "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citation omitted). Foregoing briefing the issue and raising it only briefly at oral argument leaves the court in just such a predicament here. "But it is not for the court to search the record and construct arguments." *Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017); *see also United States v. Huntington Nat. Bank*, 574 F.3d 329, 331 (6th Cir. 2009) (explaining that "a party does not preserve an argument by raising it for the first time at oral argument"). We, therefore, consider her constructive amendment/variance arguments only as briefed—that is, in relation to Counts 11 and 12.

its funding.  Because Robinson's participation in a scheme intended to induce HRSA to continue funding her organization based on material misrepresentations is sufficient to support her conviction, we move on to the question of intent.**[4]**

### 2.  Intent

"To convict a defendant of wire fraud the government must prove specific intent, which means not only that a defendant must knowingly make a material misrepresentation or knowingly omit a material fact, but also that the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission."  *Daniel*, 329 F.3d at 487 (quoting *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998)).  Generally, "the question of intent is . . . considered to be one of fact to be resolved by the trier of the facts . . . and the determination thereof should not be lightly overturned."  *Id.* (alteration in original) (quoting *United States v. Hopkins*, 357 F.2d 14, 18 (6th Cir. 1966)).  Here, there was sufficient evidence to prove Robinson's intent beyond a reasonable doubt.  Robinson was directly involved in preparing and submitting the APRs, and she signed and certified them.  Indeed, Robinson admitted that she exchanged several email messages with Dr. Tumosa in which Robinson directly referenced her personal involvement in the preparation and submission of the 2017–2018 APR to HRSA.  This evidence, along with Dr. Tumosa's confirmation that she would have recommended ending THI's funding if the reported information showed that it had not met its goals, is sufficient evidence for a rational juror to conclude that Robinson's transmission of materially false information, artificially bolstering THI's student and scholarship numbers for the 2017–2018 APR was done to induce Dr. Tumosa to continue funding the grant.

At trial, the government did not rely solely on Robinson's transmission of the reports as evidence of intent.  Agent Haines testified about the nature of the errors and their similarity to

---

**[4]**Robinson also contends that because the jury found her not guilty on Count 18, which involved the APR for 2016–2017, "that determination broke any arguable connection between" the personal purchases she was alleged to have made in 2016 and her submission of the APR for 2017–2018 (Count 19).  (Dkt. 30, Page 43).  But "the Supreme Court has repeatedly held that a jury may announce logically inconsistent verdicts in a criminal case." *United States v. Clemmer*, 918 F.2d 570, 573 (6th Cir. 1990).  Because the inconsistent verdict could have resulted from "compromise, mercy, or any number of reasons," Robinson's argument is without merit. *Id.* (citing *Dunn v. United States*, 284 U.S. 390 (1932)).

errors in other APRs. He advised that the errors were extensive and followed a specific pattern. Both the frequency of the errors and their pattern struck him "as being not right." (R. 250, PageID 4863). Such numerous errors spanning multiple funding years support a showing of intent to defraud in the context of the overarching scheme rather than inadvertence. *See United States v. Maddux*, 917 F.3d 437, 444 (6th Cir. 2019) (stating that other evasive acts—in that case, material omissions and concealments—may confirm that the conduct was "not merely inadvertent, but fraudulent"); *see also Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable are defendants['] protests that they were completely unaware . . . and the stronger . . . the inference that defendants must have known about the discrepancy"). For instance, the 2018–2019 APR referenced ID numbers of 30 students who purportedly graduated from THI's programs. THI's records, however, contained no applications, files, or other records associated with these identifications. Moreover, each student ID number was "very close in nature to a known student in the report," differing by merely one or two digits. (R. 250, PageID 4863). The jury reasonably could have inferred from this testimony and the number of incorrect identifiers in the 2017–2018 APR that Robinson provided intentionally falsified student ID numbers to inflate the number of students who graduated.

Irrespective of the false information in the 2017–2018 APR, Robinson argues that the evidence showed that she met the goals of the grant and simply had no reason or intent to inflate the numbers on the APR. As proof that THI met the goals of the grant, Robinson points to the fact that the NOAs did not reflect any carryforward money in the "Trainee Tuition and Fees" category, despite Agent Haines's testimony to the contrary. As such, there is no evidence of her intent to defraud. But these arguments are unpersuasive. As previously stated, the government presented evidence showing that the APRs were material to funding renewal. Moreover, Agent Haines testified that Robinson carried over $94,000 from the previous year to be used specifically for scholarships; this carryover would correspond to 104 additional scholarships. If these funds were carried over, the threshold number of student scholarships for 2017–2018 would have risen to 205. According to Agent Haines, however, only 161 scholarships were documented. Thus, the parties presented competing evidence on this point, and it was up to the

jury to decide whether to accept Agent Haines's testimony that THI had carryover money from the previous year that it was expected, yet failed, to use for additional scholarships.

Finally, Robinson's argument that she met the goals of the grant misses the mark for another reason. Even if her purpose for inflating the numbers was to provide additional scholarships, "[i]t is sufficient that the defendant by material misrepresentations intends the victim to [issue additional funding] that otherwise would not have been [provided]" to show intent. *See Daniel*, 329 F.3d at 488. In other words, any good-faith belief that THI would use the additional funds as it was required to does not excuse the fraudulent misrepresentations made to get those funds. The jury was therefore not expected to "look beyond [her] bad conduct to [her] overall motives." *Id.*

The district court concluded that no rational juror could find that there was a scheme to defraud as to Count 19 because the government provided no evidence of inappropriate actions by Robinson in the 2017–2018 year other than submitting the APR.**[5]** It also determined that no evidence connected Count 19 to the scheme to defraud underlying Robinson's convictions on Counts 11 and 12, because Robinson made the personal expenditures that were the subjects of those counts well before she submitted the 2017–2018 APR. The district court also found it meaningful that Robinson alternately inflated and deflated the numbers of THI students who received HRSA scholarships, yet THI still provided a substantiated threshold number of students with HRSA scholarships. These considerations were for the jury to make. As a practical matter, the statute is not concerned with how Robinson spent the funds. Showing that Robinson used grant money for personal expenditures can be considered additional evidence of her purpose for executing the overall scheme. But the scheme itself was the submission of falsified information and documents to continue receiving grant funds. The government did not have to prove that Robinson used grant funds for personal expenditures during 2017–2018. Rather, it had to show that Robinson materially misrepresented the information in the APR to obtain continued funding and that those misrepresentations could influence a prudent decisionmaker—in this case, Dr. Tumosa—to recommend continued funding. A rational juror could have found that this

---

**[5]**The district court made the same conclusion as to Count 20, which we do not address since the JOA granted as to that count was not appealed.

occurred.  Given Dr. Tumosa's testimony about tracking the progress of the grant through APR information, THI's failure to meet scholarship thresholds provided fertile ground for an inference of deliberate manipulation of the APRs.  And accepting Robinson's theory about how the evidence should have been construed strips the jury's decision of the reasonable inferences it was permitted to make about the role of APRs in HRSA's decision-making process regarding continued funding.

Finally, the district court clearly erred in its statement that "there is no evidence other than Robinson's final submission of the APRs that she checked the data at issue in these counts." (R. 206, PageID 2790).  The email messages between Robinson and Dr. Tumosa showed that Robinson was directly involved in the final submission of APRs.  As the Director of THI, her role was not merely ministerial such that one would presume her task limited to pushing a button.  Indeed, the emails themselves belie such a presumption; in one exchange Robinson confirmed she was "[t]riple checking [the APR].  Submitting this afternoon."  (R. 254, PageID 5766).  Accordingly, a rational juror could conclude that she checked the data in the APRs.  And while Robinson contends that several other items of evidence either show that she had no reason to inflate APR numbers or show that the government misstates the evidence, the examples provided do not call any particular evidence into question.  Rather, they reflect disputes about how the evidence should be viewed.  The court, however, cannot reweigh the evidence.  And in this case, the jury concluded that the evidence supported each element of wire fraud for the 2017–2018 APR.

## B. Robinson's Appeal

*Mistrial with Prejudice.*  In her cross-appeal, Robinson first argues that the district court should have granted a mistrial with prejudice based on the government's bad faith prosecution and attempts to goad her into requesting a mistrial.  Specifically, she argues that the government included numerous counts in the indictment that it simply could not prove.  Her theory is that it did so anyway to justify the admission of evidence of numerous personal purchases—the introduction of which caused her immense prejudice.  She also contends that once it became clear that the district court was going to acquit her on many of the counts, the government attempted to "have a witness make up a theory that was contradicted by the grant's financial

expert" and to violate double jeopardy by arguing a new theory of prosecution on its failing counts. (Dkt. 30, Page 49).

We review de novo a district court's denial of a motion to dismiss on double jeopardy grounds. *United States v. Koubriti*, 509 F.3d 746, 748–49 (6th Cir. 2007). But the district court's findings concerning the prosecutor's intent are reviewed for clear error. *Id.* at 749; *see also United States v. Foster*, 945 F.3d 470, 474 (6th Cir. 2019). Further, we review the denial of a defendant's motion for mistrial for abuse of discretion. *See United States v. Wimbley*, 553 F.3d 455, 460 (6th Cir. 2009). The parties dispute which standard of review should apply. While the government contends abuse of discretion is the correct standard, Robinson argues that de novo review applies. Generally, we have applied de novo review to motions to dismiss an indictment that have followed a successful motion for a mistrial, *see Koubriti*, 509 F.3d at 748–49, while we have reviewed for abuse of discretion denials of a motion for a mistrial—including those alleging prosecutorial misconduct. *See United States v. Davis*, 514 F.3d 596, 613 (6th Cir. 2008). Regardless, here, under either standard of review, the court did not err in denying Robinson's request.

The Fifth Amendment "protects individuals from being twice put in jeopardy of life or limb for the same offense, either by being twice punished or twice tried." *Koubriti*, 509 F.3d at 749 (citing *United States v. Cameron*, 953 F.2d 240, 243 (6th Cir. 1992)). "While this protection is 'fundamental to the American scheme of justice,' it is not an absolute bar to retrial in every case." *Id.* (quoting *Cameron*, 953 F.2d at 243). Where a prior proceeding ends in a mistrial rather than an acquittal, double jeopardy does not necessarily prevent the re-prosecution of the defendant. *Foster*, 945 F.3d at 474 (citing *Oregon v. Kennedy*, 456 U.S. 667, 672–73 (1982)). Whether a retrial implicates double jeopardy typically turns on who requested the underlying mistrial. *Id.* Retrial after the government requests a mistrial, for instance, is only permitted in cases of "manifest necessity"; that way, an unsuccessful prosecutor is prevented from getting another opportunity to prevail. *Id.* (citing *Saulsberry v. Lee*, 937 F.3d 644, 648–49 (6th Cir. 2019)). Contrastingly, when a defendant moves for a mistrial, it is generally deemed a waiver of her double jeopardy rights, thus allowing retrials. *Id.* There is, however, a "narrow exception" to this rule. *Kennedy*, 456 U.S. at 673. A defendant may be "provoked into requesting a mistrial

by a conspiring prosecutor who fears an acquittal." *Foster*, 945 F.3d at 474. In such cases, we have found a double jeopardy violation where a prosecutor seeks to retry a defendant after "goad[ing] the [defendant] into requesting a mistrial." *Id.* (quoting *United States v. Dinitz*, 424 U.S. 600, 611 (1976)).

As an initial matter, the government argues that Robinson withdrew her motion for a mistrial with prejudice on the record. Following the close of the government's proofs and the district court's judgment of acquittal on 15 of 20 counts, Robinson made an oral motion for mistrial—with her counsel expressly stating, "we would like the Court to grant a mistrial with prejudice. And we're not asking for it . . . without prejudice." (R. 175, PageID 1825). After entertaining argument from the defense, the district court was unpersuaded, stating that it had "seen no evidence [of] bad faith" on the government's part. (*Id.* at 1827–28). It then explained that it would not grant a mistrial that would bar future government suit; a mistrial, if granted, would be provided without prejudice, and would thus allow for the possibility of a do-over. In response, Robinson's counsel told the court they "underst[ood]" and "just wanted to note it for the record." (*Id.* at 1828). When the court asked whether that meant Robinson was "not asking for a mistrial," Robinson's counsel said "[w]e are not asking for a mistrial. That's fine, Your Honor." (*Id.* at 1828–29). Robinson's co-counsel also confirmed the decision to withdraw the motion saying, "That is correct, Your Honor." (*Id.* at 1829). And when the district court asked Robinson herself what she wanted to do, Robinson responded that she "would like to proceed with trial." (*Id.* at 1830). Thus, through counsel and on her own behalf, Robinson cast aside her pursuit of a mistrial. The question remains whether Robinson waived her argument for a mistrial.

"[W]aiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks and citation omitted). "When a defendant raises an argument by motion but then abandons the argument before the district court, the defendant has waived the argument and this Court cannot review that issue even for plain error." *United States v. Collins*, 683 F.3d 697, 701 (6th Cir. 2012) (citing *United States v. Denkins*, 367 F.3d 537, 544 (6th Cir. 2004) ("[W]e have held that this sort of abandonment of an issue raised by way of motion waives any right of appeal on that issue.")) and

*United States v. Sheppard*, 149 F.3d 458, 461 (6th Cir. 1998) ("Sheppard did not forfeit his suppression argument; he waived the argument by withdrawing his motion to suppress prior to trial. Accordingly, we are without jurisdiction to consider the argument." (footnote omitted))). On appeal, Robinson bypasses the prospect of waiver and instead insists that the district court had already ruled on her motion when she announced that she was no longer asking for a mistrial. This is debatable. While the trial court heard from and engaged defense counsel concerning Robinson's oral motion for a mistrial with prejudice, going so far as to reveal its assessment of the government's actions, it neither heard from the government on the motion nor ultimately announced a ruling or entered any order—either written or by way of docket entry—to reflect a final decision.

By framing the proceedings as she has, Robinson seems to imply that by the time she and her counsel confirmed she was no longer seeking a mistrial, the possibility of waiver had passed. But if that were so, there would have been no choice for her to make about how to proceed. Having been denied relief on the merits, the issue would have been preserved and trial could be resumed without further inquiry about her pursuit of a mistrial—especially since counsel was clear from the outset that the motion was limited to a mistrial with prejudice. Yet, inquiry there was, with Robinson confirming her desire to proceed with the remainder of the trial. As we have observed, "[i]n both criminal and civil contexts, courts refuse to consider this type of intentionally jettisoned argument." *Bannister v. Knox Cnty. Bd. of Ed.*, 49 F.4th 1000, 1011 (6th Cir. 2022). Under these circumstances, the government's argument is well-taken.

Yet, even were we to conclude in Robinson's favor on the issue of waiver, her cause would not be aided, as the district court did not err in failing to grant a mistrial with prejudice. For the sake of completeness, we discuss why this is so. A defendant attempting to prevent a retrial "has the difficult task of showing the prosecutor intended to cause a mistrial by his improper actions, and was not simply trying to obtain a conviction by any means necessary." *Koubriti*, 509 F.3d at 749. "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Kennedy*, 456 U.S. at 675–76. In other words, the defendant must

show prosecutorial bad faith.   Here, Robinson raises two primary arguments in that regard: (1) that the government introduced evidence to prove counts on which the district court ultimately acquitted her, causing her prejudice; and (2) that, in arguing against the JOA motion, the government introduced a new theory of guilt.

As to her first claim of bad faith, Robinson contends that the government should have known it could not prove that she made most of the alleged purchases with grant funds.   She points to the cross-examination of Jonathan Nyaku, an outside accountant hired by THI who testified for the government.   Nyaku went through each of the categories of expenses allegedly charged to the grant and confirmed that none were charged to the grant.   Robinson contends that Nyaku and the accounting documentation destroyed the government's entire theory of prosecution.   Robinson further contends that when it realized it was in trouble, "the Government pivoted and tried to argue that all of THI's funds were somehow controlled by the grant, but this was a bad-faith argument."   (Dkt. 30, Page 53).   Standing alone, however, the attempted pivot does not show that the government brought the charges in bad faith.   The implication of Robinson's argument is that the government should have known it would lose on a motion for JOA.   Such an argument suggests, at most, that the government was negligent in interrogating its own witness.   But we have defined "bad faith" as "not simply bad judgment or negligence, but rather . . . the conscious doing of a wrong because of dishonest purpose or moral obliquity." *United States v. Isaiah*, 434 F.3d 513, 522 (6th Cir. 2006) (quoting *United States v. True*, 250 F.3d 410, 423 (6th Cir. 2001)).

Robinson also states that the government tried to offer contrary testimony from an accountant who had no expertise in the HRSA grant she had received.   As a result of this, Robinson states that the government's "new, unsupported theory" caused her difficulties in trying to cross-examine the accountant and stifled her ability to limit the prejudice caused by the accountant's testimony.   (Dkt. 30, Page 53).   And because the jury was able to hear essentially two weeks of testimony that she spent a lot of money on personal expenses, her defense was severely prejudiced despite the evidence being thrown out.   But the key here is that the evidence was in fact stricken.   Indeed, after granting JOA on Counts 1–10 and 13–17, which were the counts specifically dealing with Robinson's use of grant money for personal expenditures, the

court struck 36 exhibits from the record and the entire testimony of 14 witnesses as well as portions of testimony from other witnesses. Because the court dismissed the personal expenses counts, and removed the evidence offered in support of those counts, Robinson's argument fails. And she has otherwise offered insufficient evidence that the government acted with ill will.

Robinson also says that when the government realized that many counts would be dismissed, it then tried to argue an entirely new theory of the case at the JOA phase: that Robinson could be found guilty if she used THI funds for personal expenses, regardless of whether they could be traced to the HRSA grants. Robinson argues that by switching its theory, the government made "a bad-faith attempt to goad [her] into a mistrial." (*Id.* at 55). But Robinson's assertion that the government acted in bad faith by raising arguments that were not sound or grounded in the law is unavailing, because, as she concedes, the district court ultimately rejected the government's theory. And the government's theory-shifting argument occurred outside the presence of the jury. *See Martin v. Tate*, 96 F.3d 1448 (6th Cir. Sept. 5, 1996) (unpublished table decision) ("The prosecutor could make faces and 'raspberries' at the defendant all day outside of the hearing of the jury without giving rise to constitutional defects in a defendant's trial. Such conduct would be unseemly, but not unconstitutional."); *see also Bernaiche v. Woods*, No. 2:09-CV-11296, 2013 WL 3936438, at *6 (E.D. Mich. July 30, 2013) (stating that disparaging comments made by prosecutor regarding an expert witness outside of the presence of the jury could not have had any impact on the trial). As such, any potential prejudice was avoided, and a mistrial was not warranted.

*Denial of JOA on Counts 11 and 12.* Robinson next argues that the district court erred when it failed to grant her post-verdict motion for JOA on Counts 11 and 12 for wire fraud. According to Robinson, the government failed to offer evidence of two essential elements—a scheme to defraud and intent—regarding the two expenditures at issue in Counts 11 and 12. But a reasonable juror could conclude otherwise, so we affirm these two convictions.

The same de novo standard of review from the government's appeal applies to this challenge. *See United States v. Connery*, 867 F.2d 929, 930 (6th Cir. 1989).

Counts 11 and 12 involved two of Robinson's wedding expenses in June 2016. Count 11 pertained to a $2,326.01 payment to GP Entertainment, the caterer for Robinson's wedding. And Count 12 dealt with a $1,158.05 payment to "Facegyrl," a makeup company in Memphis. At trial, the government introduced email messages dated July 25 and 26, 2016, between Robinson and Phylea Foster of Memphis Consulting Group. In 2016, Foster began serving as THI's outsourced financial controller. When Foster asked for clarification on the nature of several June 2016 transactions from THI's account—including the payments to GP Entertainment and Facegyrl, Robinson responded that the expenses were for a "community patient education event" and directed that they be charged as "ADRD funds for grant accounting purposes." (R. 274-7, PageID 7096–97). "ADRD" stood for "Alzheimer's Disease and Related Disorders" and was a program funded by the HRSA grant. (R. 172, PageID 1636; R. 274-13, PageID 7104) (cleaned up). Robinson further classified the GP Entertainment charge as an "[e]vent package, including rentals and [b]randed giveaways" and the Facegyrl charge as "[p]rofessional [s]ervices." (R. 274-7, PageID 7097).

Robinson contends that the government could not prove that she spent grant funds on these two expenses in June 2016 because no grant funds had been deposited into the THI operating account in June 2016. She also argues that the district court erred in holding that her emails with Foster established all the necessary elements of a wire fraud prosecution. But these arguments fail for several reasons. First, as the government aptly argues, the lack of June deposits is of no consequence. There were substantial deposits of grant funds from previous months that were still in THI's account. What's more, Robinson's email to Foster expressly directed that these wedding expenses be charged to the grant, regardless of what funds ultimately covered the expenses at the time they were paid. Second, the correspondence between Robinson and Foster demonstrates a scheme to pay her wedding expenses out of THI's operating account and to have those expenses charged to the federal grant. Robinson's mischaracterization of wedding expenses as being related to a "community patient education event" was both a material misrepresentation and evidence of an intent to defraud. *See Maddux*, 917 F.3d at 443 (stating that "for purposes of the fraud statutes, fraudulent pretenses or representations can include 'concealment'") (quoting *United States v. Kurlemann*, 736 F.3d 439, 445 (6th Cir. 2013)). Third, the expenses did not have to be charged to the grant because the wire fraud statute does

not require a successful scheme to defraud, only that the scheme occurred. *See Merklinger*, 16 F.3d at 678. And the fact that Robinson ultimately repaid the money for her wedding expenses, could be interpreted as an acknowledgment that she was not supposed to charge these types of expenses to the grant.

Given the foregoing, we see no reason to disturb the district court's ruling on Counts 11 and 12.

*Constructive Amendment or Material Variance of Indictment.* Robinson argues in the alternative that the district court should have ordered a new trial on Counts 11 and 12 because the indictment was either constructively amended at trial or was subject to a material variance. She contends that by declining to provide a description of the scheme to defraud in the jury instructions following the dismissal of multiple counts—an occurrence which resulted in a heavily redacted indictment being submitted to the jury for its deliberations—the government constructively amended the indictment. She also claims that the government alleged in the indictment that all the misrepresentations related to the scheme to defraud were made to HRSA, while the proof at trial showed no such misrepresentations. Instead, at trial the government's proofs showed that the misrepresentations were in fact made to THI's outside accounting firm. Robinson argues that this variance caused her prejudice. Because the indictment was neither constructively amended nor subject to a material variance, Robinson is not entitled to a new trial on this issue.

We review the question of whether an amendment or variance occurred de novo. *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007).

"An indictment may be the subject of an actual amendment, a constructive amendment, or a variance." *Id.* at 521. When an indictment has undergone an actual change in the text by a prosecutor, it has been actually amended; whereas a constructive amendment "results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *Id.* (quoting *United States v. Smith*, 320 F.3d 647, 656 (6th Cir. 2003)); *see also*

*United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008). Variances, on the other hand, "occur[ ] when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Bradley*, 917 F.3d 493, 502 (6th Cir. 2019) (alteration in original) (quoting *Prince*, 214 F.3d at 756–57).

There are two key distinctions between a constructive amendment and a variance. First, "constructive amendments are deemed 'per se prejudicial' because they 'infringe[ ] upon the Fifth Amendment's grand jury guarantee.' A defendant who proves a constructive amendment is thus entitled to a reversal of his or her conviction." *United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006) (quoting *United States v. Chilingirian*, 280 F.3d 704, 712 (6th Cir. 2002)). By contrast, "a defendant who establishes only that a variance has occurred must further demonstrate that his or her substantial rights have been affected." *Id.* Second, a defendant can prove a constructive amendment "only by pointing to a combination of evidence *and* jury instructions that effectively alters the terms of the indictment and modifies the essential elements of the charged offense to the extent that the defendant may well have been convicted of a crime other than the one set forth in the indictment." *Id.*; *see also Bradley*, 917 F.3d at 502. But a variance can be demonstrated "by referring exclusively to the evidence presented at trial." *Hynes*, 467 F.3d at 962.

In analyzing whether either change has occurred, however, "[t]he presentation of evidence not explicitly mentioned in the indictment does not necessarily constitute a constructive amendment or material variance." *Bradley*, 917 F.3d at 502; *see also Kuehne*, 547 F.3d at 686. Although the indictment must "inform the defendant of the charges against [her] . . . it need not inform [her] point-by-point of the manner in which the government will prove its case." *Bradley*, 917 F.3d at 504.

### 1. Constructive Amendment

Robinson's argument that the indictment was constructively amended because of deficient jury instructions is unpersuasive. First, although the indictment was heavily redacted, it still included the scheme for which she was charged as it related to Counts 11, 12, 18, 19, and 20. Second, the district court read the indictment aloud to the jury prior to its deliberations, ensuring

that the jurors were properly aware of the charged scheme. Third, as the government correctly points out, the jury instructions the district court used were based on this circuit's Pattern Instructions for wire fraud. *Compare* Sixth Circuit Pattern Criminal Jury Instructions No. 10.02 (Mar. 21, 2021), *with* Jury Instructions. For the first element of wire fraud, the Pattern Instructions provide as follows:

> (A) First, that the Defendant [knowingly participated in] [devised] [intended to devise] a scheme to defraud in order to deprive another of money or property, that is___ [*describe scheme from indictment*]."

Pattern Instructions, No. 10.02(1)(A) (italics in original). The use note states that, "[b]rackets indicate options for the court," while "[b]rackets with italics are notes to the court." *Id.* Therefore, a separate description of the scheme in the jury instructions was optional. *See United States v. Watson*, 778 F. App'x 340, 355 (6th Cir. 2019) ("[W]hen the jury is provided with instructions that 'mirror or track' our own pattern instructions, we generally do not find those instructions misleading or erroneous.") (quoting *United States v. Semrau*, 693 F.3d 510, 528 (6th Cir. 2012)).

## 2. Material Variance

There was also no material variance. Robinson argues that a material variance occurred when the government, having contended that she spent grant funds on her wedding, argued in its rebuttal closing, for the first time, that she was guilty of wire fraud even if she had not actually spent grant money on wedding expenses. That argument, however, was not inconsistent with Counts 11 and 12 of the indictment, which charged a scheme to defraud in violation of 18 U.S.C. § 1343. The scheme does not need to be successful. *See Pasquantino*, 544 U.S. at 371. It is enough for a defendant to carry out the scheme, which is the point the government made. By telling Foster to charge those expenses to the grant under the guise that the money was necessary for the grant-funded program, Robinson evinced a scheme to defraud regardless of whether the grant money in fact funded her wedding expenses or any personal expenses at all. It is no variance from the indictment to make a correct statement of law.

Robinson further contends that a variance occurred when the government introduced Phylea Foster's email messages and argued that they contained the material misrepresentations to

support Counts 11 and 12, when, according to Robinson, the indictment alleged that the misrepresentations were made only to HRSA. But the second superseding indictment described part of the manners and means of the scheme to defraud to include Robinson making "fraudulent misrepresentations to representatives of HRSA *and others* concerning THI, its operations and educational programs." (R. 107, ¶ 8, PageID 431) (emphasis added). The indictment therefore put Robinson on notice that the government might introduce misrepresentations she made to parties other than HRSA, including Foster, as evidence of her scheme to defraud.

Even if we were to find a variance, Robinson has not shown how her substantial rights have been affected. *See Hynes*, 467 F.3d at 962. In this context, "[s]ubstantial rights are affected only when a defendant shows prejudice to [her] ability to defend [her]self at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *Id.* (quoting *United States v. Barrow*, 118 F.3d 482, 488–89 (6th Cir. 1997)). While Robinson argues that the government did not provide advance notice that it would use the emails from Foster at trial, her ability to defend herself at trial was not prejudiced by the introduction of the Foster emails. Robinson and the government received Foster's emails at the same time, in a document production from accounting firm Memphis Consulting Group. The playing field was thus level with respect to this evidence; each side had the same opportunity to examine the messages, to decide whether to use them or call witnesses based on them at trial, or to use them on cross examination. Accordingly, the district court was correct in denying a new trial on this ground.

*Denial of Motion for New Trial under FRCP 33.* Robinson last argues that the district court erred in failing to grant her a new trial under Federal Rule of Criminal Procedure 33. She contends the court abused its discretion when it denied her request because the "interest of justice" required it to grant a new trial. Specifically, she states that the government included charges that it simply could not prove, tried to change its theory of the prosecution in an attempt to win at all costs, and varied or amended the indictment. Robinson further states in her reply that a remand for a new trial is necessary because the district court did not address this argument in its order denying her post-verdict motion for JOA and for a new trial. Because the record clearly establishes that Robinson is not entitled to relief, this argument fails.

We review the denial of a motion for a new trial under Federal Rule of Criminal Procedure 33 for abuse of discretion. *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015). Rule 33 provides that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rule 'does not define 'interest[ ] of justice' and the courts have had little success in trying to generalize its meaning.'" *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)). Nonetheless, several themes have emerged from Rule 33's case law. *Id.*

"The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that 'the [jury's] verdict was against the manifest weight of the evidence.'" *Id.* (quoting *United States v. Crumb*, 187 F. App'x 532, 536 (6th Cir. 2006)); *see also United States v. Legette-Bey*, 147 F. App'x 474, 486 (6th Cir. 2005). It is also "widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *Munoz*, 605 F.3d at 373 (citing *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004)). "Less clear is whether a district court may grant Rule 33 relief where the verdict is not against the substantial weight of the evidence, and where no reversible error or violation of the defendant's substantial rights has occurred, but where the district court nonetheless believes that 'the interest of justice' requires a new trial." *Id.* at 374. But the "generic 'interest of justice' language in Rule 33's text, at least at first glance, would appear to permit the grant of a new trial on the basis of perceived unfairness of less than reversible magnitude." *Id.*

Here, Robinson premised her Rule 33 motion on manifest-weight-of-the-evidence grounds. Although it could be argued that she also moved for a new trial under the substantial legal error premise, in her reply brief, Robinson seems to suggest that she moved for a new trial under the catchall "interest of justice" standard. The district court denied her request solely on the manifest-weight-of-the-evidence grounds. It did not address her argument that the issues that plagued her case gave rise to the "interest of justice" catchall. And while Robinson contends we should remand to allow the district court the opportunity to address this particular argument under Rule 33, we have stated that remand is unnecessary when "the record clearly establishes that [a defendant] is not entitled to relief." *See Johnson v. Chapleau*, 48 F.3d 1219 (6th Cir. Feb.

3, 1995) (unpublished table decision); *see also Allman v. Walmart, Inc.*, 967 F.3d 566, 575 (6th Cir. 2020) (quoting *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 655 (6th Cir. 2000) ("[T]his court may affirm the judgment of the district court on any grounds supported by the record, even if they are different from those relied upon by the district court.")).

That is the case here.  The issues Robinson raises are not a basis for a new trial.  Robinson offered insufficient evidence that the government brought these charges in bad faith.  She also failed to demonstrate that the government intended to invoke a mistrial.  And, her arguments that the indictment was constructively amended or subject to a material variance are without merit.  Because the "interest of justice" does not require the grant of a new trial in this case, this argument fails.

## IV.

Based on the foregoing, we affirm the district court's denial of JOA on Counts 11 and 12, affirm the district court's denial of a mistrial with prejudice and the motion for a new trial, reverse the district court's grant of JOA on Count 19, and remand to the district court for further proceedings consistent with this opinion.