NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0446n.06

Case No. 24-5395

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>UNITED STATES of AMERICA,<br><br>    Plaintiff-Appellee,<br><br>v.<br><br>RAYMOND VALLIER,<br><br>    Defendant-Appellant.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>**FILED**<br>Nov 06, 2024<br>KELLY L. STEPHENS, Clerk<br><br>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE<br><br>OPINION</td></tr>
</table>

Before: BATCHELDER, STRANCH, and READLER, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** The defendant appeals his conviction on two charges of making false statements in violation of 18 U.S.C. § 1001(a)(2). We AFFIRM.

**I.**

Raymond Vallier owned and operated several businesses, including North Delta Hospice and Palliative Services, LLC, an inpatient hospice service in Southaven, Mississippi. On June 20, 2019, Vallier sold North Delta to Willie Smith, who took over operations, with Vallier's continued managerial assistance. But in September 2019, North Delta stopped treating patients and stopped submitting claims to Medicare or Medicaid. North Delta was closed by the end of 2019.

On February 29, 2020, Willie Smith died from cancer.

On March 11, 2020, Mississippi had its first diagnosed case of COVID-19.

On March 27, 2020, Congress passed the Coronavirus Aid Relief and Economic Security (CARES) Act, 15 U.S.C. § 9001 *et seq*., which created the "Provider Relief Fund" and authorized the federal Health Resources and Services Administration (HRSA) to pay medical providers for the treatment and care of COVID-19 patients. To expedite payments, the HRSA automatically—without any request or application from the recipient—disbursed Fund payments to providers

based on their Calendar Year 2019 Medicare submissions. The recipients were then required to access an online portal and verify their entitlement to retain the received funds by attesting to their compliance with the Fund's terms and conditions, the most pertinent here being that the money would be used only for COVID-19 treatment purposes.

On Friday, April 10, 2020, the Fund deposited $107,568.03 into North Delta's account based on North Delta's 2019 Medicare submissions. At this point, North Delta was no longer an operating health care provider and its owner, Willie Smith, had died six weeks earlier. But Vallier still had access to North Delta's accounts, and he saw this deposit unexpectedly appear.

The next business day, Monday, April 13, 2020, Vallier paid $21,144.54 of that deposit to an American Express card that he held in the name of Vallier Estates (one of his other businesses), and wrote a check from the North Delta account to himself for $58,000. Both payments went towards Vallier's personal and business expenses, but neither paid for any COVID-19 expense.

Three days later, on Thursday, April 16, 2020, after receiving an email from the Fund, Vallier accessed the HRSA online portal to verify that North Delta was entitled to retain the money. The verification process comprised five sequential web pages. The first, titled "Step 1 Eligibility," briefly explained the CARES Act and the Fund, then asked the first eligibility question, concerning 2019 Medicare claims:

> Eligibility
>
> As a reminder, you must sign an attestation confirming receipt of the funds and agree to the terms and conditions within 30 days of payment. Should you choose to reject the funds, you must also complete the attestation to indicate this. This Payment Portal will guide you through the attestation process to accept or reject the funds.
>
> Are you a billing entity that received Medicare fee-for-service (FFS) payments from the Centers for Medicare and Medicaid Services (CMS) in 2019?
>
> ○ Yes
>
> ○ No

The page then provided some Privacy Act Statement small print, followed by a "Continue" button.

Vallier checked "Yes" and "Continue." The second page, "Step 2 Billing TIN(s)," asked for the

Taxpayer Identification Number (TIN) connected to the healthcare-providing entity. Vallier

entered North Delta's TIN and pressed continue. And the third page, "Verify Payment

Information," asked providers to "confirm the account number(s) and payment(s) you received for

each TIN." Vallier entered the North Delta bank account number and the $107,568.03 received

on April 10. The fourth page, titled "Attestations," is where this starts to get interesting. It

presented for review the TIN, account number, and amount of money received, and offered a blue

button to "Review and Accept":

> Attestations
> Please review the information below and complete the attestation process for each eligible Billing TIN.
>
> Automated Clearing House (ACH) Deposit
>
> Billing TIN
> ***[TIN number]
>
> Last Six Digits of Account Number:       Relief Fund Payment Amount
> ***[account number]                                  $ [payment amount]
>
> | Review and Accept |

Pressing the "Review and Accept" button took the user to the next page, titled "Fifth Page—Terms

and Fund Acceptance," which required the user to check two boxes:

> Please *attest to and accept* the Terms & Conditions below for each TIN you have entered. The current TIN is shown in the box to the right. Once you complete the first TIN you will be asked to attest to each TIN in the list.
>
> ☐ I acknowledge receipt of [the money] from the Public Health and Social Services Emergency Fund ('Relief Fund'), and *accept the* Terms & Conditions. . . . This is not an exhaustive list and you must comply with any other relevant statutes and regulations, as applicable. Your *commitment to full compliance with all Terms and Conditions* is material to the Secretary's decision to disburse these funds to you. Non-compliance with any Term or Condition is grounds for the Secretary to recoup some or all of the payment made from the Relief Fund.

3

These Terms and Conditions apply directly to the recipient of payment from the Relief Fund. In general, the requirements that apply to the recipient, also apply to sub-recipients and contractors under grants, unless an exception is specified.

□ By receiving and accepting Relief Fund payment, *you attest that in accordance with* the 'Coronavirus Aid, Relief, and Economic Security Act' or the 'CARES Act', you are eligible for this payment. You acknowledge that you may be asked to submit to the review process established by the U.S Department of Health and Human Services, including its contractor (collectively, 'HHS'), to determine your eligibility for this payment. Additionally, upon request by HHS, you will provide any and all information related to the disposition or use of the funds received under the Relief Fund for auditing and/or reporting purposes. *I attest that I have the legal authority to act on behalf of the provider group that has received payment under the Relief Fund. . . .*

By providing your email and phone number, you agree that HHS or its contractor may send you communications or call you regarding Relief Fund payment. You understand that you need to give us *the most up to date contact information*.

Note that the italics above have been added here for emphasis. The "Contact Information" section had fields for first, middle, and last name, email address, and phone number, followed by two address options, "Service Address" and "Billing Address." The page concluded with two further attestations:

□ I have read and agree to the Optum Pay Enrollment Agreement Terms and Conditions.

‿I Accept Payment‿          ‿I Reject Payment‿

The phrase "Terms & Conditions" in the above passage was a hyperlink to a different web page, titled "Terms and Conditions – Page 1," and subtitled "Provider Relief Fund Terms and Conditions." These Terms and Conditions required, in pertinent part:

• The Recipient certifies that it billed Medicare in 2019; *currently provides diagnoses, testing, or care for individuals with possible or actual cases of COVID-19*; is not currently terminated from participation in Medicare; is not currently excluded from participation in Medicare, Medicaid, and other Federal health care programs; and does not currently have Medicare billing privileges revoked.

4

- The Recipient certifies that the Payment will *only be used to prevent, prepare for, and respond to coronavirus*, and shall reimburse the Recipient only for health care related expenses or lost revenues that are *attributable to coronavirus*.

Again, the italics have been added for emphasis.

Vallier checked the two boxes, accepting the Terms & Conditions and attesting that North Delta was complying with them. That is, Vallier attested that North Delta was "currently" providing treatment for COVID-19 and that it would use the money only for COVID-19 care— even though North Delta was not treating anyone, certainly no COVID-19 patients, and Vallier had already spent almost $80,000 of the money on other personal (non-COVID-19) expenses. Then Vallier entered North Delta's "most up to date" contact information as Willie Smith's name, North Delta's business address and telephone number, and his (Vallier's) own email address. Vallier then clicked to accept payment.

In May 2020, the HRSA began to investigate Vallier. In October 2021, agents from the HRSA and the Tennessee Bureau of Investigation interviewed Vallier, who told them that North Delta had stopped treating patients in September 2019, closed before the start of the COVID-19 pandemic, and (falsely) that the $107,568 deposit from the Fund was still in the bank account. In November 2021, the government met with Vallier and his attorney to present its case that Vallier had made false statements on the verification forms to secure the money. Four days later, Vallier paid back the $107,568—but the government nevertheless indicted him on six charges.

Among those charges, Count 4 addressed Vallier's attestation in the online forms that the money would be used only to prevent, prepare for, and respond to COVID-19, even though he knew he had already spent some of the funds on other (non-COVID-19 related) things. Count 5 addressed Vallier's identification of Willie Smith in the contact information, even though Smith was dead. Both charged Vallier with violating 18 U.S.C. § 1001(a)(2), which "required proof that

5

[Vallier] made a statement that was false and material, that [he] acted knowingly and willfully, and that the statement pertained to a matter within the jurisdiction of a federal agency." *See United States v. Hills*, 27 F.4th 1155, 1186 (6th Cir. 2022) (citing Sixth Circuit Pattern Jury Instruction 13.02) (other citation omitted). On August 17, 2023, after a six-day jury trial and three days of deliberations, the jury convicted Vallier on Counts 4 and 5.

After trial, Vallier filed a consolidated motion for judgment of acquittal or a new trial, claiming that the evidence was insufficient for conviction because the language in the statements in the online forms to which he had responded were too ambiguous to make his response to those statements knowingly false, and that the district court erred by refusing to give the jury his requested instruction about ambiguity. For Count 4, Vallier argued that the word "accept" made the statement too ambiguous to prove that he agreed to comply with the Fund's terms because he read "accept" as meaning that he received and understood the terms, not that he agreed to comply. But the district court explained that the terms plainly required Vallier "to certify that the payment will only be used to prevent, prepare for and respond to coronavirus, and that the payment shall reimburse the recipient only for healthcare related expenses or lost revenues that are attributable to coronavirus." The court held that the jury reasonably determined that Vallier's attestation (that the money was for COVID-19 expenses) was knowingly false.

For Count 5, Vallier argued that the "Contact Information" section in the online forms was ambiguous because it "never directly states that the person [completing the form] needs to use his own name," and further contending that "it is certainly reasonable to list the name of the owner, who is currently on file with Medicare and Medicaid." In rejecting this argument, the district court explained that "the jury heard this debate in full" at trial and found Vallier's listing of Willie Smith as the appropriate contact to be a false statement. Importantly, the form states, "I attest that I have

6

the legal authority to act on behalf of the provider group that has received payment in the Relief Fund," making clear that "Contact Information" refers to the person completing the form and attesting to it. And, for good measure, the form also asked for the "most up to date" contact information, making the name of a dead person the most obvious *incorrect* response.

Finally, Vallier argued that the court abused its discretion by refusing to give the jury his "ambiguity" instruction, which said: "If a defendant's statement or the government's question or form requiring an answer is ambiguous, it is incumbent upon the government to negate any reasonable interpretation that could make the defendant's statement factually correct." The government argued that the instruction was confusing, too vague to be applied, and an incorrect statement of the law. The district court agreed that the proposed instruction was "ambiguous, unclear, and not a pattern instruction that identifies a specific ambiguity," and added that the instruction was unnecessary because the court had instructed the jury on "honest mistake" and "reasonable doubt." The court denied Vallier's motion.

On April 15, 2024, the district court sentenced Vallier to 12 months of probation.

## II.

As he did in his post-trial motions, Vallier argues that the evidence was insufficient to convict him because the statements at issue were ambiguous. On a defendant's claim of insufficient evidence, our review is de novo, and the controlling question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hall*, 20 F.4th 1085, 1105 (6th Cir. 2022) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). We "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict," recognizing that "circumstantial evidence alone is sufficient to sustain

a conviction and [that the] evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Robinson*, 99 F.4th 344, 353-54 (6th Cir. 2024) (quotation marks and citations omitted). "A defendant claiming insufficiency of the evidence therefore bears a very heavy burden." *Id.* (quotation marks, editorial marks, and citations omitted).

Vallier argues that he did not knowingly and voluntarily make a false statement by clicking "I accept . . . the Terms & Conditions" because he reasonably interpreted the word "accept" as meaning that he "received" the Terms & Conditions, not that he agreed to comply with them. *See* Appellant's Brief at 40-41 ("Under this reasonable interpretation, Vallier's statement was true because he did receive the terms and conditions willingly, officially, and favorably. The terms and conditions were hyperlinked on the attestation page."). True, in a vacuum, "accept" can have multiple meanings, including "receive." But the remainder of the paragraph, web page, and program provide context, and in context this is not a reasonable interpretation of what it means to "accept . . . the Terms & Conditions." Terms & Conditions are intangible requirements, not a material (or constructively material) item capable of physical acceptance, such as in "accepting the payment." Rather, when speaking of "terms and conditions," it is commonly understood that "accept" means "agree to comply with," such as in accepting the terms of a contract or a plea agreement. *See*, *e.g.*, *United States v. Taylor*, 14 F. App'x 546, 551 (6th Cir. 2001) ("Once the district court chose to accept the [plea] agreement, however, the court was required to follow its provisions." (footnote omitted)). Therefore, the phrase "I accept . . . the Terms & Conditions," as used here, has only one reasonable interpretation: "I agree to comply with the Terms & Conditions." This phrase was not ambiguous.

Vallier also argues that, because certain phrases—such as "currently provides . . . diagnoses, testing, or care for individuals with possible or actual cases of COVID-19" and "lost

revenues that are attributable to coronavirus"—were not defined, Vallier could not have knowingly made a false statement by attesting to them. The government answers that there was nothing vague about these phrases, nor any need for specific definitions—any reasonable person (and juror) could give these phrases their ordinary meaning and understand what they meant. And contrary to Vallier's peripheral argument, the fact that HRSA later construed these phrases broadly in finding that claimants had satisfied the conditions does not make them ambiguous. More to the point, even if Vallier were confused about what was meant by "currently" treating "possible" cases and attributing lost revenue to COVID-19, the jury could reasonably have concluded (and apparently did) that North Delta was not treating *any* patients for *anything*, so Vallier's attestation was necessarily false, no matter how he interpreted "currently," "possible," or "attributable to COVID-19."

Vallier argues that he did not knowingly and voluntarily make a false statement by entering Willie Smith's name in the "Contact Information" because he reasonably thought that Willie Smith (despite being dead) was the appropriate contact person because Smith was still listed as North Delta's owner in the Medicare system. But as the district court pointed out, the jury heard this debate at trial and found this to be a false statement. The government adds that the overall context of the form, which refers to the attester in the first or second person, makes it evident that it was requesting the attester's name. And there remains an inescapable flaw in Vallier's contention: the form did not request the owner's name, or the registered name, or even the responsible party's name; the form requested "contact information," meaning a contact person's name, and even added that it must be "the most up to date contact information." It is wholly unreasonable to interpret a request for the name of a contact person as asking for the name of a person who has died.

Vallier also argues that his use of Willie Smith's name was not material because Vallier had authority to act on behalf of North Delta, so he could have used his own name. The government answers that the use of Smith's name was material because Vallier might not have had—or might not have been certain that he had—authority to accept the funds, given that Smith owned North Delta, North Delta was closed, and Smith had recently died, creating a significant question about Vallier's authority to accept that money on behalf of North Delta. Regardless of Vallier's true authority, a rational juror could find based on the evidence presented at trial that Vallier falsely used Smith's name on the form in order to avoid such troublesome questions.

Vallier has not shown that his conviction was based on insufficient evidence.

## III.

As he did in his post-trial motion, Vallier argues that the district court erred by refusing to give the jury his requested "ambiguity" instruction. We review for abuse of discretion a district court's refusal to give proposed jury instructions. *United States v. You*, 74 F.4th 378, 395 (6th Cir. 2023). Such a refusal "constitutes reversible error only if (1) the instructions correctly state the law; (2) the instructions are not substantially covered by other instructions given to the jury; and (3) the failure to give the instructions impairs the defendant's theory of the case." *Id*. at 396.

Vallier argues that the district court's refusal to give his proposed ambiguity instruction impaired his ambiguity defense and that defense was not adequately served by the court's instructions on good faith and reasonable doubt. Recall that Vallier's proposed instruction said:

> If a defendant's statement or the government's question or form requiring an answer is ambiguous, it is incumbent upon the government to negate any reasonable interpretation that could make the defendant's statement factually correct.

The district court rejected this instruction, finding it "ambiguous, unclear, and not a pattern instruction that identifies a specific ambiguity," and explained that it had thoroughly instructed the jury on "reasonable doubt" and "honest mistake."

Under the instructions that the district court delivered, in order to convict Vallier the jury had to find that he willfully and intentionally attested to the truth of the statements—that the funds would be used only for COVID-19 and that Willie Smith was the proper contact—despite his knowing that the attestation was false. And the jury had to find that this was not an accident or an honest mistake—including an accident or honest mistake caused by a purported ambiguity. At bottom, Vallier could not *know* the attestation was false if he had a good faith belief that it was true. This instructed the jury to consider Vallier's ambiguity defense, which he argued thoroughly in closing.

Vallier has not shown that he was entitled to his requested jury instruction.

## IV.

For the forgoing reasons, we AFFIRM the judgment of the district court.