NOT RECOMMENDED FOR PUBLICATION

File Name: 26a0047n.06

Case No. 24-5858

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Jan 26, 2026

KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| Plaintiff - Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KARL HAMPTON, | ) | O P I N I O N |
| Defendant - Appellant. | ) | |
| | ) | |

BEFORE: McKEAGUE, GRIFFIN, and THAPAR, Circuit Judges.

McKEAGUE, Circuit Judge. After a years-long scheme in which Karl Hampton spent over $1.2 million dollars of other peoples' money, a jury convicted him on four counts of wire fraud, four counts of mail fraud, three counts of money laundering, and one count of conspiracy to commit money laundering. He was sentenced to 60 months' imprisonment. Now, Hampton appeals his conviction, arguing that (1) the Government did not provide sufficient evidence to sustain his fraud counts, (2) the district erred by failing to include a jury instruction on testamentary capacity, and (3) a duplicitous indictment violated his Sixth Amendment right to a unanimous jury. Because his arguments are unpersuasive, we AFFIRM his conviction.

## I. BACKGROUND

### A. Factual Background

Barbara Wade was a widow who lived alone in Franklin, Tenneessee. As of 2017, Wade only had one living relative—her niece, Laurie Baum. Baum, who lived across the country in California, would call Wade every few months to check in on her. But on December 25, 2019, when Baum called to wish Wade a merry Christmas, she could not get ahold of her aunt. Both Wade's cell phone and home phone had been disconnected. Alarmed, Baum called one of her friends in Tennessee looking for a potential explanation. Unbeknownst to Baum, Wade had been moved to an assisted-living facility. But when Baum then called the facility, she still could not reach her aunt. A man Baum had never heard of—"Mr. Hampton"—had placed a "no-calls/no-visitors order" on Wade. Trial Tr. Volume 1-B, R. 252 at PageID 1557.

This did not sit well with Baum, so she called the Franklin Police, who said they would perform a wellness check on Wade. Within the hour, Baum received an unexpected phone call from Hampton, marking the first time the two spoke. Hampton tried to assure Baum that she had nothing to worry about, claiming that he was handling all of Wade's affairs, including the management of Laura Clark's estate (the "Clark Estate"), for which Wade was the executor.[1] Hampton also informed Baum that he was selling Wade's house. Confused by Hampton's sudden emergence as a prominent figure in Wade's life, Baum asked why he had instituted a no-calls/no-visitors order. Hampton suggested that he did not want people pestering Wade.

Baum remained concerned. After additional conversations with the Franklin Police, Baum filed for an emergency conservatorship to ensure Wade had proper care from a representative who was not taking advantage of her. Less than a week later, the court appointed Stacy Neisler to serve as Wade's emergency conservator.

---

[1] Laura Clark was Wade's sister and Baum's mother.

Neisler, an experienced conservator, recognized that Wade needed immediate help. She began reviewing Wade's health and financial situation, realizing that Wade—who was now 87 years old—had gone years without receiving primary care even though she had previously been diagnosed with dementia. In terms of her finances, Wade was unaware of a $500,000 line of credit taken out in her name, she had not paid income tax in over three years, her bank accounts were almost entirely depleted, and her credit card was close to maxed out. After investigating, it became clear that Hampton had taken Wade's money.

Hampton had executed a scheme in which he gained Wade's trust to manage her financial affairs. Once he had access to Wade's money, he spent it for personal purposes and funneled it into his own bank accounts. In the process, Hampton defrauded multiple people and financial institutions, including: Wade, Kitty Harris (who was entitled to money from the Clark Estate), and SunTrust Investment Services ("SunTrust").

### 1. Hampton's Relationship with Wade

As an exterminator, Hampton provided pest-control services at various condominiums in the greater Nashville area. He was responsible for a number of properties, including Wade's. In 2016, Hampton started spending an unusual amount of time at Wade's home—so much so, that neighbors took notice; Hampton was at Wade's home regularly by 2019. During this time, Wade was noticeably frail, and neighbors were worried that she was in a vulnerable place.

Eventually, Hampton's interactions with Wade shifted; he began bringing Wade lunch and taking her to various appointments. Hampton then started taking control of Wade's finances for self-serving purposes.

### 2. Liquidating Laura Clark's Estate to Defraud Wade and Harris

When Clark passed away in 2017, Wade became the executor of the Clark Estate. Thus, Wade was responsible for dividing the Clark Estate's assets according to Clark's will. Half of the

Clark Estate's assets were left to Wade, and the other half to Harris (the deceased's best friend).[2] In administering the Clark Estate, Wade worked with a lawyer and various financial institutions. But Wade was overwhelmed as she tried to manage the Clark Estate. Hampton got involved to assist her.

Hampton joined Wade's calls with the Clark Estate's banks to provide account details and personal information that Wade could not remember. He also conducted calls with Wade by his side, claiming to act in her interest as her personal representative. But Hampton was not just providing assistance, he was driving Wade's actions, taking advantage of Wade's trust and her inability to act on her own. Sometimes claiming to be Wade's personal representative, and other times claiming to be her son or godson, Hampton led calls to various banks in order to liquidate the Clark Estate's assets, even when Wade expressed concerns about emptying the accounts.

While Hampton used some of the Clark Estate money to pay Wade's bills, Hampton transferred around $272,382 of the Clark Estate's funds into various accounts that he used for his personal purposes, like purchasing personal vehicles. All told, Hampton spent almost two years— from February 2018 to December 2019—slowly liquidating the Clark Estate and spending the money.

To steal from the Clark Estate, Hampton made numerous false statements. He made false statements to Wade by communicating to her that he would be acting in her best interests as her personal representative. He told Wade (on a recorded phone call) that he kept the Clark Estate's money in an investment account so Wade would be able to use her share either now or in the future. But that was not true; he spent the money, mostly on himself.

Hampton also made false statements to Harris, who was expecting $225,000 from the Clark Estate per Clark's will. Hampton wanted to keep Harris's share of the Clark Estate money for himself. So, to prevent Harris from raising any concerns, Hampton sent her two checks totaling

---

[2] Baum did not receive monetary assets from the Clark Estate, but she was the beneficiary of insurance and retirement policies in Clark's name.

4

$12,000, accompanied by letters—that he and his wife wrote in Wade's name—suggesting that more money would come Harris's way eventually. Harris continued to wait for more payments, but they never came. Instead, Hampton took Harris's remaining share of the Clark Estate for his personal pleasure.

### 3. Acquiring Power of Attorney on Behalf of Wade and Assets in Wade's Will

While Hampton was in the process of liquidating the Clark Estate's assets, he also pursued other avenues to acquire Wade's money. In early 2019, without Wade present, Hampton visited the law offices of Jay Adcox, an attorney in Tennessee specializing in wills and trusts. Adcox was suspicious of Hampton, who initially showed up without an appointment and wanted to set up a revocable living trust for Wade in which he (Hampton) would be the beneficiary. Hampton claimed he was already Wade's agent who had power of attorney, but his only purported proof was a document not prepared by a lawyer. Adcox informed Hampton that Wade would need to come in and clarify her intentions. They scheduled a future appointment.

After meeting with Wade and determining that she had testamentary capacity,[3] Adcox drafted a number of documents for her. One such document granted Hampton power of attorney to act on Wade's behalf for financial matters; Adcox considered Hampton's previously presented document suspicious. Per the new power-of-attorney document, Hampton could only act in Wade's best interests, and he could not give gifts to himself. Adcox also prepared a revocable living trust and pour-over will for Wade. Wade's trust and will did not grant Hampton any money while she was still alive, but upon Wade's death, Hampton would have access to some of her assets. And even for the assets Hampton *could* acquire after Wade's death, the document made

---

[3] Adcox's determination was limited to whether Wade was competent to sign a will. Adcox did not analyze whether or not Wade was capable of managing her general business affairs, he did not conduct any cognitive testing, and he did not investigate her ability to care for herself. Witness testimony indicates that Wade's mental capacity fluctuated over the period of Hampton's scheme. At times she seemed sharp and aware, but at other times she was showing signs of dementia and cognitive decline.

clear that Hampton would only receive money after showing a genuine need—the preference was to preserve funds in the trust for the future.

### 4. Defrauding Wade to Steal from Her Bank Accounts

Hampton abused his power of attorney to Wade's detriment. Wade never expressed the intent to leave Hampton money before her passing, and the power-of-attorney agreement prevented Hampton from giving himself gifts. Nonetheless, separate from the Clark Estate's funds, Wade had hundreds of thousands of dollars in checking accounts that Hampton stole. Hampton developed a system where he would write checks to himself—from Wade's accounts—and Wade would sign them. Wade signed the checks with the understanding that Hampton would use a specific amount of money for whatever purpose was listed on the checks' memo line (e.g., paying the IRS, her attorneys, and other specialists).

But Hampton wrote false statements on the checks. Sometimes, he used fake memo lines, lying about the intended purpose of the expenditure to keep the money for himself; other times he wrote fake amounts, telling Wade he needed inflated amounts of money, only to direct a smaller amount to the purported purpose while keeping the remainder for himself. Hampton then spent this money that he stole from Wade on personal purchases. He used some of the money to rent and buy various cars—his friends saw him driving five different cars during this time period. And he spent around $1,600 on lottery tickets every day, sitting around a gas station with friends to check for winnings. Hampton also walked around with bags full of cash, sometimes carrying up to $15,000. In short, he spent it as he pleased.

Hampton also created Falcon Company, a fake business that he used as another avenue to funnel Wade's money into his control. Wade thought Falcon Company was a real business entity.[4]

---

[4] Independent of Hampton using the Falcon Company account as a landing spot for account transfers, Wade occasionally gave Hampton money for this purported business.

**5. Defrauding SunTrust to Take Out a $500,000 Line of Credit in Wade's Name**

With Wade's checking-account balance running low, Hampton created a new source of funds. Wade had around $1.2 million worth of investments in an account at SunTrust. In December 2019, Hampton accompanied Wade to SunTrust for an appointment with her client representative. Together, they told the client representative that they wanted to finance renovations on Wade's home so they could ultimately sell the house, and they sought advice on how best to fund this project. Because the purpose of the funds was for a specific, short-term use, the client representative recommended a select line of credit rather than either liquidating assets (and dealing with projections of the assets' value) or taking out cash (and losing its purchasing power). The client representative made this recommendation in Wade's presence, and he suggested using her investment account as collateral. Notably, had Wade and Hampton sought funds for a different purpose, the client representative testified that he likely would have recommended an alternative source of funding; this interest-only line of credit—which kept Wade's cash assets available— made sense because Wade and Hampton said that the money would be paid back quickly, right after the renovations were complete and they sold the home. In theory, the proceeds from selling the home would pay off the line of credit.

The client representative referred Wade and Hampton to a bank representative who could set up the line of credit. Hampton met with the bank representative alone, operating as Wade's power of attorney. Hampton reiterated the plan for the money: renovate Wade's home and then pay off the line of credit once the property sold. He represented that the whole process would take six months. Because of the short-term purpose, the bank representative confirmed that a select line of credit made sense, although for a different purpose, he would have suggested a different funding source. Hampton acquired a $500,000 line of credit in Wade's name, using her investment assets as collateral.

Within two months, Hampton had nearly maxed out the line of credit, taking out $480,000 of cash. Hampton's withdrawals were deemed suspicious, so the bank representative sought

Wade's personal approval before letting Hampton take out the final draw worth $80,000. Whether he took out the money on his own, or took it out with Wade present, Hampton always said—both to SunTrust and to Wade—that the funds would go towards renovating Wade's home. But Hampton did not use any of the money for this purpose. As the emergency conservator later learned in her investigation, the home was practically empty; the carpets were uprooted, the lighting fixtures were removed, there was blood on the floor, and the house had a terrible stench coming from the bathrooms.[5]

Instead, Hampton spent the money from the SunTrust line of credit on himself. He used the money to purchase an ownership interest—for himself, not Wade—in an extermination business called Franklin Pest Control. He rented out a luxury apartment in Wade's name, even though, by this time, Wade had moved into the assisted-living facility. And he bought his wife a ring that cost over $20,000. Hampton also transferred money into various bank accounts that he controlled. Some of the money went into accounts he could access as Wade's power of attorney. And he also transferred some of the money into his personal bank accounts. Hampton never paid off the line of credit. Eventually, the conservator paid SunTrust $481,000 to cover the line of credit plus interest.

\*  \*  \*

All told, Hampton spent over $1.2 million of Wade's and Harris's money throughout the course of this scheme. He spent some of it directly from Wade's accounts, but he also obtained the money by transferring it to his own personal accounts and his fake business account. He made false statements to Wade, Harris, SunTrust, and various other financial institutions to execute this scheme.

---

[5] A car that Hampton had recently purchased was stored in the garage, also stripped of its parts. Additionally, at one point, Hampton was carrying around what appeared to be an elderly woman's jewelry; Hampton claimed he got it from cleaning out a house, and he was looking to sell it. Some of Wade's jewelry was unaccounted for when the emergency conservator investigated the state of Wade's property.

## B. Procedural History

Hampton was indicted on four counts of wire fraud, four counts of mail fraud, three counts of money laundering, and one count of conspiracy to commit money laundering. After a six-day trial, a jury convicted Hampton on all 12 counts. He was sentenced to 60 months' imprisonment (which was below the Guidelines range) and ordered to pay $1,240,438.06 in restitution.

Hampton now appeals, arguing that (1) the Government failed to produce evidence of a material misrepresentation, and thus did not prove a necessary element of mail fraud and wire fraud, (2) the district court erred by not giving a jury instruction on testamentary capacity, and (3) the indictment was duplicitous, violating his Sixth Amendment right to a unanimous jury. As explained herein, each argument fails.

## II. EVIDENCE OF MATERIAL MISREPRESENTATION

Hampton asserts that the evidence presented at trial—which included over 130 exhibits and 20 witnesses[6] from the Government—failed to elicit sufficient evidence of a material misrepresentation, so the jury's verdict on the mail-fraud and wire-fraud counts should be reversed. But "[o]verturning a jury verdict on appeal is no easy task." *United States v. Simpson*, 138 F.4th 438, 448 (6th Cir. 2025). And, as Hampton concedes, he made a Rule 29 motion at trial that was based on specific grounds, so "all grounds not specified in the motion are waived." *United States v. LaVictor*, 848 F.3d 428, 457 (6th Cir. 2017) (quoting *United States v. Chance*, 306 F.3d 356, 369 (6th Cir. 2002)). Because the sufficiency-of-the-evidence argument he advances on appeal was not included in his specific Rule 29 motion,[7] "the burden for prevailing on [his] sufficiency challenge is even more demanding than usual." *Id.* We review his challenge under the manifest-miscarriage-of-justice standard, which means the "conviction will stand . . . unless the record

---

[6] Wade passed away before the trial, so she did not testify.

[7] Hampton's Rule 29 motion argued that the wires and mailings did not further the fraudulent scheme due to their timing. And as Hampton acknowledges in his briefing, he did not argue that the evidence failed to show a material misrepresentation at trial.

contains no evidence of guilt." *United States v. Prather*, 138 F.4th 963, 968 (6th Cir. 2025) (citing *United States v. Sherer*, 770 F.3d 407, 411 (6th Cir. 2014)); *see also United States v. Woods*, 14 F.4th 544, 555 (6th Cir. 2021) ("A defendant can only succeed under this standard if the record is 'devoid of evidence pointing to guilt.'" (quoting *United States v. Childs*, 539 F.3d 552, 558 (6th Cir. 2008))).

Mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, "hav[e] essentially the same elements, except for the use of mails versus the wires." *United States v. Robinson*, 99 F.4th 344, 355 n.2 (6th Cir. 2024) (quoting *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013)). "[T]he [G]overnment must prove '(1) a scheme or artifice to defraud; (2) use of [an] interstate wire [or mail] in furtherance of the scheme; and (3) intent to deprive a victim of money or property.'" *Id.* at 354 (quoting *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003)); *see also United States v. Petlechkov*, 922 F.3d 762, 766 (6th Cir. 2019) (mail fraud). "[A]s an element of the 'scheme or artifice to defraud' requirement, the [G]overnment must prove that the defendant said something materially false." *Robinson*, 99 F.4th at 354 (first alteration in original) (quoting *Daniel*, 329 F.3d at 486). In this context, a statement "is deemed materially false if it could have influenced the decision of a 'person[] of ordinary prudence and comprehension.'" *Id.* (alteration in original) (quoting *Petlechkov*, 922 F.3d at 766). Importantly, the statement need not actually influence the person; so long as the "false statement was capable of influencing" a person of ordinary prudence, the materiality requirement is present. *Petlechkov*, 922 F.3d at 767. "The fact that [a] false statement caused its intended result" does, however, serve as "strong evidence that it was material." *Id.*

There exists ample evidence in the record that Hampton made false statements capable of influencing persons of ordinary prudence. According to witness testimony, he made false statements to Wade about how he spent the Clark Estate money, insisting that he put the funds in Wade's investment account so she would get to use it in the future, when that was not the case. And in Hampton's own testimony, he discussed making numerous false statements; he wrote fake

memo lines and inflated dollar amounts on checks that Wade signed, preventing Wade from knowing that Hampton was funneling her money into his own accounts for personal purposes. Wade did not want Hampton to access any of her funds until her death, and even then, she only wanted Hampton to take money after demonstrating a genuine need. But Hampton's false statements kept Wade in the dark. Similarly, his false statements to Harris—sending her letters to communicate that her money from the Clark Estate was forthcoming—eased her concerns and allowed Hampton to continue to take funds from the Clark Estate.

As the evidence shows, Hampton's false statements to Wade and Harris (made by phone and mail, respectively) "were designed to lull the victims into a false sense of security," *United States v. Lane*, 474 U.S. 438, 451 (1986) (quotation omitted), and they were capable of deceiving persons of ordinary prudence so that Hampton could continue his fraudulent acquisition and use of the Clark Estate's funds. In fact, his statements worked. Wade was unaware that Hampton improperly spent her money on personal purchases, and Harris was waiting for Hampton to send the rest of the money she was entitled to. Both Wade and Harris were influenced by Hampton's statements in ways that allowed him to further his spending. The fact that Hampton's false statements accomplished their objective provides powerful evidence that they were material. *See Petlechkov*, 922 F.3d at 767.

Hampton insists that these statements "increased the probability that [he] would be detected and apprehended" by authorities, and were thus not lulling statements that could be part of a fraudulent scheme. *United States v. Maze*, 414 U.S. 395, 403 (1974). But Hampton's argument relies on extracting inapplicable language from *Maze*. In *Maze*, the defendant did not use mailings to *conceal* his conduct. *Id.* The *Maze* mailings were merely correspondence between victims trying to identify who bore the financial loss; the mailings did not advance the defendant's fraud scheme or provide any deceptive cover. *Id.* at 396, 400-03. Instead, the *Maze* mailings increased the defendant's likelihood of detection and apprehension because it allowed his victims to recognize

the issue. *Id.* at 403. According to *Maze*, such statements are not part of a fraud scheme. *Id.* at 400-03.

Hampton's statements were different in kind. Hampton's false statements concealed his conduct from his victims; he "lull[ed] the victims into a false sense of security" to "postpone their ultimate complaint to the authorities, and therefore make [his] apprehension . . . less likely than if no mailings had taken place." *Id.* at 403 (outlining statements that would be included in a fraudulent scheme). The question is whether detection and apprehension were less likely, not whether his false statements made him undetectable. Hampton's statements meet this bar. And, despite his contention to the contrary, Hampton's fraud was not uncovered due to these statements—it was Hampton's attempts to cut Wade off from visitors and phone calls that raised his niece's suspicions and led to an eventual investigation into his conduct. The fact that the Government's case eventually relied on Hampton's false statements does not diminish their lulling value—the statements furthered Hampton's scheme by preventing his victims from recognizing his fraudulent conduct, which allowed him to continue spending other people's money. There is sufficient evidence to conclude that Hampton's false statements were material and part of his fraudulent scheme.[8]

There is evidence in the record showing Hampton made other material false statements as well. According to witness testimony, he convinced Wade that Falcon Company was a legitimate enterprise, which induced her to give the "entity" money when, in reality, it was a fake business that stood as a front for Hampton's personal spending. And Hampton provided a false purpose for

---

[8] Hampton also argues that these false statements did not grant him the initial access to Wade's finances, so they must not be material. Circumstantial evidence shows that Hampton deceived Wade into obtaining his status as power of attorney, convincing Wade that he was her son. Those false statements are material and part of his scheme. But even if we set aside the suspicious-at-best circumstances in which Hampton was able to ascend from an exterminator to an agent with power of attorney for an elderly woman suffering from dementia, his false statements lulled victims in ways that allowed him to continue improperly obtaining Wade's and Harris's money. Such false statements are material. *See Robinson*, 99 F.4th at 357 (explaining that the defendant's "participation in a scheme intended to induce [the victim] to *continue funding* her organization based on material misrepresentations is sufficient to support her conviction" (emphasis added)).

the SunTrust line of credit: renovations on Wade's home to raise its value for a sale. Hampton claims this was not a material misrepresentation, as he could have acquired this line of credit without providing the purpose for the funds. But because Hampton lied about using the money for a short-term project to renovate Wade's home, the SunTrust representative endorsed—in Wade's presence—a funding mechanism that preserved her cash accounts, money that Hampton took for himself. Additionally, both the bank representative and Wade relied upon this false statement to approve Hampton's final $80,000 withdrawal, enabling Hampton to continue funneling himself money from the line of credit. Once again, this was an example of Hampton's false statements influencing persons of ordinary prudence to further his scheme. The record has ample evidence of Hampton's material misrepresentations, which more than satisfies our manifest-miscarriage-of-justice review to uphold the jury's verdict.

### III. JURY INSTRUCTION ON TESTAMENTARY CAPACITY

During the trial, Hampton wanted the district court to give a jury instruction on testamentary capacity. The Government objected, arguing that testamentary capacity is a specific legal issue pertaining to the validity of a will that is unrelated to (1) the charges, (2) the Government's theory, and (3) anything that the jury needed to decide. As the Government put it: whether or not Wade had testamentary capacity was irrelevant because even if the will was valid, Hampton still could have taken advantage of her dementia to defraud and mislead her. In response, Hampton argued that it would be helpful for the jury to have the instruction because the Government was trying to argue that Wade was not competent to handle her own affairs, and her testamentary capacity could speak to whether or not she was vulnerable to fraud.

The district court rejected the jury instruction. It noted that testamentary capacity is a precise legal doctrine that only applies in disputing the validity of certain documents, and the validity of Wade's will and revocable living trust was not contested in this case. The district court told Hampton he could argue that Wade was competent to deal with her affairs, and that Wade

13

knew how Hampton was spending the money. Also, the district court gave a jury instruction on the good-faith defense, explaining that if Hampton acted on an honestly held belief rather than an intent to defraud, the jury should find him not guilty. On appeal, Hampton argues that the district court erred in rejecting the testamentary-capacity instruction.

"[W]e review a challenge to the trial court's denial of a requested jury instruction for abuse of discretion." *United States v. Jakits*, 129 F.4th 314, 329 (6th Cir. 2025). And we "reverse only if the denied instruction was: (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concern[ing] a point so important in the trial that the failure to give it substantially impair[ed] the defendant's defense." *Id.* (second alteration in original) (quoting *United States v. Anderson*, 67 F.4th 755, 764 (6th Cir. 2023)).

Testamentary capacity was not so important in the trial that the failure to give the instruction to the jury substantially impaired Hampton's defense. As the district court noted, testamentary capacity is unrelated to the issues of this case. Under Tennessee law, testamentary capacity is a specific legal term that applies narrowly to probate issues. *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) (explaining that the testamentary-capacity analysis is used to evaluate a challenge to a will, and it only speaks to whether or not an individual "understand[s] the force and consequence of the act of making the will" (quoting *In re Est. of Elam*, 738 S.W.2d 169, 171-72 (Tenn. 1987))); *see also In re Est. of Smallman*, 398 S.W.3d 134, 159-60 (Tenn. 2013). Even if a person has testamentary capacity, it does not necessarily mean she is of sound mind to manage her business affairs. *Smallman*, 398 S.W.3d at 159 ("A lesser degree of mental capacity is required to execute a will than is required to execute a contract . . . ."). To determine testamentary capacity, Tennessee courts look only to "the mental condition of the testator at the very time of executing the will." *Id.* (quoting *Elam*, 738 S.W.2d at 172). And, because "mental capacity may fluctuate in an individual who is debilitated and terminally ill," a person's mental state while executing a will may be different than her mental state at another time. *Id.* Thus, whether or not an individual has testamentary capacity is an orthogonal determination from whether or not she is of

sound mind to conduct her general business affairs, and it certainly does not imply that she is sharp enough to resist fraud.

Further, the Government did not challenge the validity of Hampton's power of attorney or the revocable living trust. Trial Tr. Volume 4, R.255 at PageID 2382 ("[Y]ou can assume that Mrs. Wade did have testamentary capacity for all we care. . . . [O]ur theory is that the defendant misled her and others throughout the course of the time that we've alleged in the indictment, that her dementia and her lack of capacity factor into her ability to be[] defrauded. . . . But we're not challenging the will here."). And the jury's determination on the issue of testamentary capacity would have no bearing on whether or not Wade was of sound mind to generally monitor Hampton's use of her accounts; testamentary capacity is a limited determination of her mental state the moment she executed her will and revocable living trust. *Smallman*, 398 S.W.3d at 159. Hampton was free to argue that Wade was of sound mind to conduct her business affairs, and that his actions were conducted in good faith. But because testamentary capacity plays no part in that determination, the district court did not abuse its discretion in rejecting the jury instruction.

## IV. NON-DUPLICITOUS INDICTMENT

Hampton's final argument targets the phrasing of the indictment as duplicitous, claiming that the Government framed his conduct as multiple fraud offenses rather than alternative means to commit one crime. So the argument goes, because each fraud count referenced a scheme that targeted multiple victims, Hampton was charged with three distinct crimes in each count: a scheme to defraud Wade, a scheme to defraud Harris, and a scheme to defraud SunTrust. According to Hampton, his Sixth Amendment right to a unanimous jury would be violated if jurors found him guilty of different offenses under a single count.

Hampton concedes that he did not raise this issue below, and he did not object to the jury instructions that presumably "clear[ed] up any ambiguity created by the [allegedly] duplicitous indictment," so our review "is limited to plain error." *United States v. Kakos*, 483 F.3d 441, 444-

45 (6th Cir. 2007). The core of Hampton's argument rests on the potential that the jury was not unanimous. So, naturally, in our review, we "look[] to the instructions actually given at trial to assess the risk that [Hampton] was convicted by a non-unanimous verdict." *Id.* at 444-45. "An indictment is duplicitous if it sets forth separate and distinct crimes in one count." *Id.* at 443 (quoting *United States v. Davis*, 306 F.3d 398, 415 (6th Cir. 2002)).

The district court instructed the jury that Hampton's mail-fraud and wire-fraud charges involved "a scheme and artifice to defraud Barbara Wade and/or Kitty Harris and/or various financial institutions and credit and loan-issuing institutions and/or others." Trial Tr. Volume 6, R.257 at PageID 2901 (wire fraud); *id.* at PageID 2904 (mail fraud). In explaining the elements of both crimes, the district used the indefinite article "a" with the singular form of the nouns to describe one "scheme" that was also an "artifice." *See* The Chicago Manual of Style ¶¶ 5.12, 5.76, 5.77, 5.80 (18th ed. 2024); *cf. Niz-Chavez v. Garland*, 593 U.S. 155, 162-63 (2021). And that singular scheme had multiple victims, as demonstrated by the inclusive "and/or." *See* The Chicago Manual of Style, *supra*, ¶ 5.254. Together, the instructions signaled to the jury the alternative paths to reach conviction: there was one singular scheme in which Hampton sought to defraud multiple victims in his plan to spend a pool of money that did not belong to him. Fraud against any victim would suffice for the singular scheme.

This is far from an irregular characterization of mail fraud and wire fraud. And we have upheld similar indictments and jury instructions in the past. *See United States v. McQuarrie*, 817 F. App'x 63, 80 (6th Cir. 2020) (approving "one scheme that involved the defrauding of different victims over an extended period using different representations"); *United States v. Dolan*, 99 F.3d 1140, 1996 WL 599819, at *4 (6th Cir. 1996) (unpublished table decision) ("[T]he defrauding of different people over an extended period of time, using different means and representations, may constitute but one scheme." (quoting *United States v. Mastelotto*, 717 F.2d 1238, 1245 (9th Cir. 1983))). Including the multiple victims of Hampton's singular scheme in each count of mail fraud

and wire fraud did not constitute error, let alone plain error. The indictment—and the jury instructions—set forth a single crime with multiple victims in each count.

## V. CONCLUSION

For these reasons, we AFFIRM Hampton's conviction.